STATE of Missouri, Respondent,

v.

Michael I. OWSLEY, Appellant.

No. 77688.

Supreme Court of Missouri,
En Banc.

Dec. 23, 1997.

Rehearing Denied Jan. 27, 1998.

William J. Swift, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, Judge.

A Jackson County jury convicted Michael Owsley of first degree murder, kidnapping, and two counts of armed criminal action for which he was sentenced to death and consecutive terms of life, fifteen years, and fifteen years, respectively. Owsley's motion for post-conviction relief was dismissed for non-compliance with Criminal Procedure Form No. 40 as required in Rule 29.15. Because the death sentence was imposed, this Court has jurisdiction of the appeal. *Mo. Const. art. V, sec. 3.* We affirm the conviction and sentence on all counts as well as the dismissal of the post-conviction relief motion.

## I. FACTS

The evidence at trial, which we review in the light most favorable to the verdict, *State v. Storey,* 901 S.W.2d 886, 891 (Mo. banc 1995), reveals the following:

On April 18, 1993, Elvin Iverson, the murder victim in this case, drove from Kansas

City, Missouri, to Junction City, Kansas, to sell drugs. Iverson was accompanied by Ellen Cole. When the two returned to the house in Kansas City where Iverson was staying, defendant Owsley and a codefendant named Hamilton confronted them and ordered them to lie on the ground. Both Iverson and Cole complied on observing that Hamilton carried a Tech–9 semi-automatic weapon with a silencer and Owsley carried a 12–gauge sawed-off shotgun.

Hamilton then demanded to be told "where the [drug] money was." Iverson pleaded that he did not have the money and that he had given it to another person who had accompanied him to Junction City. After Hamilton pressed unsuccessfully for more information, Owsley spoke directly to Iverson, calling him "a thorough nigger" and saying that "you're [Iverson] begging for your life now, nigger." Owsley backed up his malicious comments by punching and kicking Iverson and, at times, beating his face with the sawed-off shotgun. When Iverson continued to deny that he had any money, Owsley then took a bag from Hamilton and began smothering Iverson. At that point, Hamilton asked Cole about the money, and in response, she lied by offering to take them to a key. Hamilton then tied Cole and Iverson together by their feet with an electrical extension cord, and either he or Owsley covered them with a blanket. Owsley stood over them, hitting them with the barrel of the shotgun and said, "One of you live; one of you die." He put the gun to Iverson's head, but before he could fire, Hamilton instructed him to place a pillow over Iverson's head. After putting the pillow in place, Owsley pulled the trigger, killing him instantly.

In making their getaway, the two gunmen untied Cole and took her along. Owsley forced her into Hamilton's car, and as Hamilton drove away, Owsley followed in another car. A short time later, Cole managed to escape from Hamilton's car and notify the police.

## II. ALLEGATIONS OF PRETRIAL ERROR

### A. Irreconcilable Conflict with Counsel

Owsley first claims that the trial court erred in denying his several motions to dismiss counsel and substitute new counsel. The motions were based on alleged irreconcilable conflict between Owsley and his lawyer. Denial of the motions, Owsley explains, deprived him of his constitutional right to effective assistance of counsel. Alternatively, Owsley claims that at minimum, substitute counsel should have been appointed for the October 17, 1994, hearing on the motion to dismiss counsel because Owsley's counsel actively opposed some of the factual allegations in the motion.

A trial court's ruling on a motion to dismiss counsel is a legitimate exercise of its discretion and will not be disturbed on appeal unless there is clear abuse of discretion, *State v. Hornbuckle*, 769 S.W.2d 89, 96 (Mo. banc 1989), and "the appellate court will indulge every intendment in favor of the trial court." *Id.* To "prevail on a claim of irreconcilable differences with counsel, the defendant must produce objective evidence of a 'total breakdown in communication.'" *State v. Parker*, 886 S.W.2d 908, 929 (Mo. banc 1994), *citing Hornbuckle*, 769 S.W.2d at 96. Proof of a total breakdown in communication is established, according to Owsley, not only by the interaction between the two, but also by counsel's statements to others and counsel's ineffective assistance throughout the proceedings. The colorable claims within the wide array of counsel's alleged misconduct includes: failing to furnish Owsley with copies of the police reports, to meet and consult with him, and to discuss his defense; failing to pursue all of the investigation that Owsley requested; speaking condescendingly to Owsley; breaching the attorney-client privilege by telling another client about Owsley's case and characterizing Mr. Owsley as a liar; calling Owsley a "pain in the ass;" commenting to a newspaper and on radio that death penalty cases are not processed as expeditiously as they should be; commenting in an objection to the prosecution's voir dire questions about prior criminal experiences that if he did the same, "we will be here for two weeks;" telling the venire panel that "[w]e're not drinking, playing cards and drinking rum, which we would rather being [sic] do-

ing;" asking a venire panel member whether he could consider both life imprisonment and death if Owsley were found guilty; stating to the venire panel that "I don't like [experts] personally," even though he intended to rely on one.

■ None of Owsley's claims are well taken. To the extent that the "irreconcilable differences" were born of counsel's alleged misconduct at trial, Owsley's remedy was to present the claims in a properly filed Rule 29.15 motion. Obviously, the trial court should not be expected to discharge and replace counsel during the course of the trial itself. The one other claim cognizable in a post-conviction relief action is counsel's alleged failure to fully investigate the case. This matter was fully addressed by the trial court during one of the pretrial hearings on Owsley's motion to discharge counsel. After considering Owsley's position, the court concluded that the information Owsley sought to investigate was irrelevant to the issues in the case and then warned Owsley that he would waste his counsel's time for legitimate trial preparation if he continued to send him on "wild goose chases." From our review of the record, the court was correct in this determination.

■ The claims that relate more directly to a "breakdown in communication" are also insufficient to establish irreconcilable conflict. From the motion hearings before the court and on the face of the motions themselves, Owsley made it clear that he was in fact still communicating with his lawyer. The essence of his complaints, instead, was that he simply was not pleased with the tone and content of his lawyer's comments and criticism. As the court found after allowing Owsley to fully air his concerns, the comments and criticisms to which Owsley objected, and his resulting displeasure, was the product of Owsley's own uncooperativeness with his lawyer. Owsley is not permitted to generate an "irreconcilable conflict" through his own misconduct. *See Hornbuckle,* 769 S.W.2d at 97.

Even though Owsley himself was the cause of the problem, the court nonetheless took the exemplary step to alleviate the stress of the situation by appointing co-counsel to assist in Owsley's defense. Having provided Owsley co-counsel with whom Owsley could presumably communicate, the court did all and more than was required. The point is denied.

■ Owsley's alternative claim that he was effectively unrepresented at the October 17, 1994, hearing on his motion to discharge his lawyer, fares no better. During the hearing, Owsley presented his lengthy handwritten motion to his lawyer who read it to the court, after which Owsley himself addressed the court at length. When Owsley had finished, his lawyer contested some of the allegations Owsley had made about him and their interaction in preparing for trial. When a dispute of this sort arises, it is the court's responsibility to inquire into the matter, and the defendant's lack of legal training is immaterial. *United States v. Blum,* 65 F.3d 1436, 1441 (8th Cir.1995). Moreover, the defendant Owsley in this case has not shown how he was prejudiced. From our review of the record, it is clear that Owsley made all the points he sought to make on the question of irreconcilable conflict, and he does not claim otherwise. By conducting a full hearing on the matter to inquire about the allegations, Owsley's interests were sufficiently protected.

### B. Speedy Trial Rights Violated

Owsley also claims that the trial court erred in denying his numerous motions to dismiss for lack of a speedy trial. Owsley was arrested and placed in jail on April 22, 1993, but was not brought to trial until October 18, 1994, roughly eighteen months later. This delay, he contends, violates speedy trial guarantees under the United States and Missouri Constitutions as well. as sections 545.780, 545.890, and 217.460, RSMo 1994.

■ The United States Supreme Court mandates a balancing of four factors when determining whether a defendant's constitutional right to a speedy trial was violated. *Barker v. Wingo,* 407 U.S. 514, 533, 92 S.Ct. 2182, 2193–94, 33 L.Ed.2d 101 (1972). The factors include the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker,* 407 U.S. at 530, 92 S.Ct. at

2191–92. In this case, the dispositive factors are those pertaining to the reason for the delay and the prejudice to the defendant. The eighteen month delay was mostly attributable to the various actions taken by defendant or on his behalf, which included requests for a continuance, a second medical examination by various other experts, a change of judge, and additional counsel. The only delays attributable to the State resulted from its requests for the initial competency exam and extension of time for the exam to be completed. The State in no way attempted to delay the trial, while in contrast, a great deal of time was spent handling Owsley's motions. For these reasons alone there is no constitutional violation.

The prejudice factor also weighs against the defendant. To establish prejudice, Owsley states that the eighteen month delay between arrest and trial "precipitated the need for [counsel] to request a mental examination . . . [that] was then necessary because Mr. Owsley had expressed the desire to plead guilty and be sentenced to death." He also maintains that the delay caused him to become despondent. Despite these developments, Owsley does not demonstrate how they affected the trial and disposition of his case, and from our review of the record, we find that no prejudice resulted. In addition, Owsley claims that the lengthy delay exacerbated the tension between his counsel and him, which then culminated in the irreconcilable conflict. Having determined that there was no irreconcilable conflict, this point is meritless. In sum, Owsley's failure to show prejudice also defeats his claim of a constitutional violation.

Reliance on sections 545.780 and 545.890—Missouri's speedy trial statutes—is also meritless. Application of section 545.780 is dependent on the finding of a constitutional violation. Because we have already found that Owsley was not denied his constitutional right to a speedy trial, the statute provides him no relief. Section 545.890 does not apply if "the delay shall happen on the application of the prisoner." Sec. 545.890. Because the delay in this case was largely due to actions taken by Owsley, this section affords him no relief either.

In a final point, Owsley argues that section 217.460 requires that a case be brought to trial within 180 days. This section is a part of the Uniform Mandatory Disposition of Detainers Law that applies to intrastate detainers. As discussed above, Owsley was responsible for nearly all of the delays. The delays that he caused tolled the 180 day requirement. *See State ex rel. Clark v. Long,* 870 S.W.2d 932, 940–42 (Mo.App. 1994); *Smith,* 686 S.W.2d at 547–48. Point denied.

### C. Suppression of Confession

Owsley next asserts that the trial court erred when it denied both a motion to suppress and a motion to reconsider suppressing his confession on grounds that his confession was involuntary. Specifically, Owsley claims that he only implicated himself after the police interrogating him promised not to seek the death penalty.

A confession that becomes part of the basis of a conviction must be voluntary or else the defendant is denied due process. *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964). It is the State's obligation to prove, by a preponderance of the evidence, that a confession was voluntarily given. *State v. Feltrop,* 803 S.W.2d 1, 12 (Mo. banc 1991). The test of voluntariness is whether, under the totality of the circumstances, the "defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed." *State v. Lytle,* 715 S.W.2d 910, 915 (Mo. banc 1986). Review of a trial court's ruling on a motion to suppress is to determine only if the decision was supported by substantial evidence, *Feltrop,* 803 S.W.2d at 12, and "[t]hat there is evidence from which the trial court could have arrived at a contrary conclusion is immaterial." *Id.*

The record in this case shows that five people—Owsley, his mother, the prosecuting attorney, and the two police officers who questioned Owsley—testified at the suppression hearings. The prosecuting attorney and the police officers all testified that they

made no offer of leniency and that they never stated that the death penalty had been "waived." This testimony, regardless of evidence to the contrary, was substantial evidence that amply supported the court's finding that no offers had been made to induce Owsley's confession. Therefore, the trial court did not err when it overruled Owsley's motion to suppress.

## III. ALLEGATIONS OF TRIAL ERROR

### A. Guilt Phase

#### 1. Intoxication Evidence

Owsley complains that his right to due process was violated when he was prohibited under section 562.076.3, RSMo 1994, from introducing during the guilt phase evidence of his alleged intoxication. Evidence of his intoxication from alcohol and drugs, he submits, would have negated the requisite mental state of deliberation. In the alternative, he claims that Instruction No. 12, based on MAI–Cr3d 310.50—the voluntary intoxication instruction—should not have been submitted to the jury. The instruction, he alleges, violated his right to due process, because it relieved the State of proving all of the elements of the crime. Moreover, he claims that the limited evidence of his consumption of alcohol—evidence that was admitted on other grounds—did not support the submission of Instruction No. 12.

■ The introduction of voluntary intoxication evidence is severely restricted by section 562.076.3, that states:

Evidence that a person was in a voluntarily intoxicated or drugged condition may be admissible when otherwise relevant on issues of conduct but in no event shall it be admissible for the purpose of negating a mental state which is an element of the offense. In a trial by jury, the jury shall be so instructed when evidence that a person was in a voluntarily intoxicated or drugged condition has been received into evidence.

Because defendant made no clear or direct challenge to this statute either at trial or in his motion for new trial, he has not preserved the issue for review. Refusing the admission of Owsley's intoxication evidence did not con-stitute manifest injustice; therefore, we decline to undertake plain error review.

■ Owsley's alternative claim, while preserved for appeal, has no merit. Instruction No. 12 accurately tracks MAI–CR 310.50, which reflects this Court's decision in *State v. Erwin,* 848 S.W.2d 476 (Mo. banc 1993), and the subsequent statutory change to section 562.076. *See* sec. 562.076; MAI–CR 310.50. As this Court has already decided, MAI–CR 310.50 does not relieve the State of its burden of proving all of the elements of a crime, *State v. Taylor,* 944 S.W.2d 925, 936 (Mo. banc 1997); thus, it did not violate defendant's due process rights.

■ To support the submission of Instruction No. 12, there need only be evidence that a person was voluntarily intoxicated. *See* sec. 562.076; MAI–CR 310.50, Notes on Use. In this case, evidence of Owsley's voluntary intoxication—that he drank a pint and a half of gin before committing the murder—was admitted through the testimony of Detective Cridlebaugh and the dialogue on the video taped confession. This evidence was more than sufficient. Accordingly, the instruction was properly given to prevent that evidence from being used to negate Owsley's mental intent. *See Taylor,* 944 S.W.2d at 936. The point is denied.

#### 2. Autopsy Report Evidence

■ Next, Owsley argues that Dr. Berkland, the medical examiner of Jackson County, should not have been allowed to testify as to the findings of another doctor who performed the autopsy on the victim, Mr. Iverson. Owsley contends that such testimony is hearsay because the performing doctor was available to testify. The record, however, shows that Dr. Berkland did not testify about the performing doctor's opinion but instead testified as an independently qualified expert who based his own opinions on the factual information in the autopsy report. In *State v. Taylor,* 944 S.W.2d 925 (Mo. banc 1997), this Court found no error where the same Dr. Berkland testified, after an independent review of autopsy photographs, about the position of entry and exit wounds on the

victim. *Id.* at 939. This case is essentially no different. The point is denied.

### 3. Reasonable Doubt Definition

Owsley argues that in both the guilt and the penalty phases of the trial, the definition of "reasonable doubt" submitted to the jury was error because it used the phrase "firmly convinced," which does not satisfy due process concerns. This Court has repeatedly rejected this argument. *See, e.g., State v. Brown,* 902 S.W.2d 278, 287 (Mo. banc 1995); *State v. Chambers,* 891 S.W.2d 93, 105 (Mo. banc 1994). Point denied.

### B. Penalty Phase

### 1. Mitigating Evidence

Owsley claims that he should have been allowed during the penalty phase to introduce sixteen photographs depicting scenes from his childhood. The trial court excluded all but one picture on relevancy grounds. In the penalty phase, a "defendant is allowed to introduce *any* evidence that may mitigate the penalty imposed." *State v. Whitfield,* 837 S.W.2d 503, 512 (Mo. banc 1992). More particularly, relevant mitigating evidence includes that which refers to "the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." *Penry v. Lynaugh,* 492 U.S. 302, 318, 109 S.Ct. 2934, 2946–47, 106 L.Ed.2d 256 (1989). The pictures in this case, however, do not show that Owsley came from a disadvantaged background or that he had good character, and they depict nothing relating to the offense in question. Moreover, they were cumulative to the oral testimony of his penalty phase witnesses. The trial court did not abuse its discretion in excluding this evidence. The point is denied.

### 2. Closing Argument

Owsley argues that during the penalty phase closing argument, the State 1) misstated the law concerning the use of mitigating circumstances, 2) engaged in improper personalization, and 3) resorted to impermissible name calling, all of which require a new penalty phase hearing.

For his first point, Owsley cites the following comments:

The next thing you must do is you must go on. And Instruction No. 22, there are the mitigating circumstances, and you must consider each one of these six mitigating circumstances. You must consider whether any of those six even come close to outweighing this. Do they outweigh this to the extent that you believe, that *you all must believe that one of those mitigating circumstances outweigh those circumstances* that you have found beyond a reasonable doubt, outweigh that to the extent that he should be serving life imprisonment without possibility of parole instead of getting a death sentence. (emphasis added)

Owsley did not object to this comment at trial; thus, this point will be reviewed for plain error only. *State v. Parker,* 886 S.W.2d 908, 927 (Mo. banc 1994); Rule 30.20. Standing alone, the State's comment might create some confusion, but the actual instruction given was exceedingly clear:

If you decide that one or more aggravating circumstances exist to warrant the imposition of death, as submitted in Instruction No. *19,* each of you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist.

The clarity of the actual instruction prevented any possible manifest injustice or miscarriage of justice. Therefore, we have no discretion to grant plain error relief. *State v. Simmons,* 955 S.W.2d 729, 736–37 (Mo. banc 1997); Rule 30.20.

The claims of personalization and name calling derive from the prosecutor's additional comments:

Should you show him more mercy than he showed to Elvin Iverson? What have we seen that says there's a reason to do that? Because we have seen a picture of him as a child? Every brutal murderer starts off as a child. You know, we see this and our hearts go out, hearts go out to mother, and she tries to go to you saying you, as women, you have to understand me as mothers. Don't kill my child. Of

course, Mr. Iverson's mother didn't have the opportunity to beg like that, *and we all love our sons and daughters, and we all hope for them they will grow up to be something other than a monster like Michael Owsley.* We hope they will do something with their lives. (emphasis added)

The passage emphasized above was not impermissible personalization because it did not "suggest personal danger to the jurors or their families." *State v. Kreutzer,* 928 S.W.2d 854, 876 (Mo. banc 1996); *State v. Storey,* 901 S.W.2d 886, 901 (Mo. banc 1995). Additionally, it was not prejudicial name calling. Although name calling is strongly discouraged, it is not prejudicial where there is evidence to support such a characterization. *State v. Clemmons,* 753 S.W.2d 901, 908 (Mo. banc 1988); *State v. Burke,* 719 S.W.2d 887, 891 (Mo.App.1986); *State v. Munoz,* 678 S.W.2d 834, 835 (Mo.App.1984) (where the State presented overwhelming evidence that the defendant sodomized his nine year old son, no plain error for State to refer to him as a "monster" in closing argument). Given the manner in which Owsley dispatched his victim, to characterize him as a "monster" is not inapt. The trial court, therefore, committed no error.

## IV. POST–CONVICTION RELIEF UNDER RULE 29.15[1]

After sentencing, Owsley timely filed a *pro se* Rule 29.15 motion. He was then appointed counsel who filed an amended Rule 29.15 motion and a motion to disqualify the judge for cause. The motion court judge overruled the motion to disqualify and then dismissed the amended Rule 29.15 motion because it did not comply with Criminal Procedure Form 40.

### A. Disqualification of Judge

■ Owsley claims that the denial of his motion to disqualify the judge violated his right to due process and to be free from cruel and unusual punishment. In post-conviction relief motions, "the movant may disqualify a judge on the due process ground

that the judge is biased and prejudiced against the movant." *Haynes v. State,* 937 S.W.2d 199, 202 (Mo. banc 1996). However, the bias or prejudice must stem from a source outside the proceedings and "result in an opinion on the merits on some basis other than what the judge learns from participation in the case." *Id.*

■ In this case, the bias of which Owsley complains is that the judge had a definite extrajudicial, approving opinion of the quality of work performed by Owsley's trial counsel. The sole evidence of this bias consists of the judge's comments during the hearings on Owsley's motion to discharge his counsel. At those hearings, the judge stated nothing more than that counsel enjoyed a reputation as one of the best criminal defense lawyers in Kansas City and that he had recently convinced a jury in another capital murder case to spare the defendant's life. These statements reflecting the judge's professional respect for counsel do not establish that the judge would be biased in ruling on the effectiveness of counsel's performance in this case. Furthermore, the judge disposed of the Rule 29.15 proceedings on the basis of appellant's counsel's noncompliance with Form 40; thus, the judge was not required to rule on the merits of trial counsel's performance. The point is denied.

### B. Form 40 Compliance

■ Owsley next complains that the trial court improperly imposed the requirements of Criminal Procedure Form 40 to his amended Rule 29.15 motion. Rule 29.15 requires expressly that any relief sought pursuant to 29.15 shall substantially follow Criminal Procedure Form 40. Rule 29.15(b). The reason for requiring compliance with Form 40 when seeking relief under 29.15 is "to provide not only the state but also the trial court, and the appellate court on review, with an orderly and concise statement of the grounds on which movant bases his request for post-conviction relief." *State v. Katura,* 837 S.W.2d 547, 553 (Mo.App.1992).

1. Rule 29.15 has gone through several revisions both before and after this case went to trial. All of the references to Rule 29.15 refer to the form of the Rule as it read in 1995, the time of the Rule 29.15 hearing.

Paragraph 8 of Form 40 directs the movant to state "concisely all the grounds known to you for vacating, setting aside or correcting your conviction and sentence." Paragraph 9 then requires a concise statement of "the facts which support each of the grounds set out in (8), and the names and addresses of the witnesses or other evidence upon which you intend to rely." Once counsel is appointed, "[i]f the motion does not assert sufficient facts ... counsel shall file an amended motion that sufficiently alleges the additional facts and grounds." Rule 29.15(e); see *White v. State*, 939 S.W.2d 887, 893 (Mo. banc 1997).

With respect to the amended motion, the trial court made the following "Conclusions of Law":

The court takes judicial notice of the fact that movant's amended motion is 96 pages long. Not only is this motion not concise, it is not even remotely in the form of Form 40. Sections III through X seem to contain movant's grounds for relief, however, the facts necessary to support these allegations appear to be contained in section II. Section II is entitled Chronological Narrative of Rights Violations Revealed in the Record and that is precisely what it contains. Movant has listed excerpts from both the trial and pre-trial transcripts in chronological order. These entries have little or no explanation as to what 29.15 allegations they are meant to support and[, to] add to the confusion those sections of the amended motion that purport to contain movant's grounds for relief, when any factual support is offered at all, refer generally to point 6. which is the list of chronological rights violations. It appears to the court that after examining movant's grounds in sections III through X it must go through this point 6 and find factual support for each allegation on its own. As already discussed, one of the purposes of the requirements of form 40 is to provide the trial court with a convenient format for reviewing movant's allegations and, as already discussed movant's amended motion does not come close to meeting the requirements of form 40 or Rule 29.15

Based on these conclusions, the trial court entered an order that "movant's amended motion for relief is overruled in its entirety as it does not comply with the conciseness requirement of Supreme Court Rule 29.15." Having independently reviewed the amended motion, this Court agrees with the trial court's determination. The amended motion violates Paragraphs 8 and 9 of Criminal Procedure Form 40 and as such mandates dismissal.

Nevertheless, Owsley argues that the requirements of Form 40 should not have been imposed on him because compliance is only required under Rule 29.15(b), pertaining to original, *pro se* motions, and thus compliance is not required for amended motions authorized under Rule 29.15(f). However, Rule 29.15, taken as a whole, clearly requires any and all requests for relief under the Rule to conform substantially to Form 40. Rule 29.15(b). Moreover, because of the special purpose of a Rule 29.15 motion—to achieve finality in criminal proceedings—exceptions should be disfavored. See *White*, 939 S.W.2d at 893 (noting that 29.15 motions are collateral attacks and will be honored, but must be balanced with the goal of bringing finality to criminal process and conserving "scarce public resources"); *Smith v. State*, 798 S.W.2d 152, 153 (Mo. banc 1990) (stating "[o]f sole significance is the fact that this Court's rules for postconviction relief make no allowance for excuse," when time limits were not followed). Indeed, Owsley's counsel had no reason to believe the Form 40 requirements would not be followed. In *State v. Katura*, 837 S.W.2d 547 (Mo.App.1992), decided three years before Owsley's amended motion was filed, the Court of Appeals dismissed a "rambling, vague and prolix" amended motion of a mere 40 pages (less than half of the size of Owsley's amended motion), because it did not comply with Paragraphs 8 and 9 of Form 40. *Katura*, 837 S.W.2d at 553.

In a fall-back position, Owsley alleges that the motion court should have honored his request to hold a Rule 62.01 conference before dismissing the amended motion. Under Rule 62.01, the court, in its discretion, may convene a conference to address any confusion in the presentation of motions in

civil cases. However, as the State aptly noted, a conference to "facilitate the orderly consideration of Mr. Owsley's claims"—as requested by Owsley—flies in the face of Rule 29.15 itself; the claims are supposed to be orderly in the first instance and should require no "facilitation." The motion court did not abuse its discretion on this point.

Owsley's related complaints that the motion court neither held an evidentiary hearing nor entered findings of fact and conclusions of law as required under Rule 29.15 must be denied as well. These requirements apply only when a Rule 29.15 motion has been perfected by compliance with Form 40.

### C. Possible Abandonment

[30] In view of the dismissal of the amended motion, Owsley next argues that he was abandoned by his counsel, and that the 29.15 court should have conducted a *"Luleff"* abandonment hearing. Abandonment hearings have been required by this Court to determine the cause of 1) counsel's failure to file an amended motion, *Luleff v. State*, 807 S.W.2d 495, 498 (Mo. banc 1991); 2) counsel's failure to have the amended motion verified, *State v. Bradley*, 811 S.W.2d 379, 384 (Mo. banc 1991); and 3) counsel's failure to file the amended motion in a timely fashion. *Sanders v. State*, 807 S.W.2d 493, 495 (Mo. banc 1991). In this case, Owsley's post-conviction counsel filed a timely and verified amended motion. The fact that its poor content and structure resulted in its dismissal does not mean that Owsley was abandoned. His abandonment claim is nothing more than a claim of ineffective assistance of post-conviction counsel, which is "categorically unreviewable." *State v. Hunter*, 840 S.W.2d 850, 871 (Mo. banc 1992); *see also Pollard v. State*, 807 S.W.2d 498, 502 (Mo. banc 1991). The point is denied.

### V. PROPORTIONALITY REVIEW

■ Finally, Owsley contends that the death sentence is improper because this Court will not engage in a meaningful proportionality review. Particularly, he claims 1) that this Court does not afford adequate notice with a meaningful opportunity to be heard on the proportionality issue, 2) that

this Court does not maintain a complete database of cases as required by section 565.035 because cases in which life sentences are imposed are not included, and 3) that the sentence in this case is excessive and disproportionate. The purpose of the proportionality review, as this Court has repeatedly explained, is merely to prevent freakish and wanton applications of the death penalty. *State v. Parker*, 886 S.W.2d 908, 933 (Mo. banc 1994). The review performed sufficiently meets that standard. *See State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993); *see also Zeitvogel v. Delo*, 84 F.3d 276, 284 (8th Cir.1996) (upholding this Court's proportionality review). The process for the review has been clearly stated in the statute and in past cases, and its repetition offers no precedential value. *See Parker*, 886 S.W.2d at 933–34, *Ramsey*, 864 S.W.2d at 328. Additionally, any due process claims, such as the ones Owsley brings here, have already been rejected by this Court. *State v. Weaver*, 912 S.W.2d 499, 522 (Mo. banc 1995). Claims contesting the adequacy of the database as a factor in the proportionality review have also previously been rejected. *Parker*, 886 S.W.2d at 933; *Whitfield*, 837 S.W.2d 503, 515 (Mo. banc 1992). Thus, Owsley's only remaining point is the proportionality of his crime to the death sentence.

■ After careful review of the record, this Court holds that the trial court's imposition of the death sentence did not result from the influence of passion, prejudice, or any other arbitrary factor. *See* section 565.035.3(1). The jury unanimously found four statutory aggravators: 1) that Owsley was convicted of a prior aggravated robbery and assault; 2) that the victim was murdered for money; 3) that the murder involved torture and depravity of the mind, and was outrageously and wantonly vile, horrible, and inhuman; and 4) that the murder was committed during a burglary and attempted robbery. The finding of these aggravators is amply supported by the evidence.

The death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. Owsley ambushed his victims, bound their feet together, demanded to know where the money was, beat

the victims, played a game with their lives, and finally murdered one of them with a shotgun blast to the head. Defendants in similar cases who torture and execute someone while perpetrating a crime on that person are often sentenced to death. *State v. Smith,* 944 S.W.2d 901, 925 (Mo. banc 1997); *State v. Whitfield,* 939 S.W.2d 361, 372 (Mo. banc 1997); *State v. Tokar,* 918 S.W.2d 753 (Mo. banc 1996); *State v. Oxford,* 791 S.W.2d 396, 402 (Mo. banc 1990); *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc 1989); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Walls,* 744 S.W.2d 791 (Mo. banc 1988); *State v. Foster,* 700 S.W.2d 440 (Mo. banc 1985); *State v. Gilmore,* 681 S.W.2d 934 (Mo. banc 1984); *State v. Johns,* 679 S.W.2d 253 (Mo. banc 1984); *State v. Lashley,* 667 S.W.2d 712 (Mo. banc 1984); *State v. Gilmore,* 661 S.W.2d 519 (Mo. banc 1983); *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983). Point denied.

## VI. CONCLUSION

The judgments of conviction and sentence, and the dismissal of the Rule 29.15 motions are affirmed.

All concur.