STATE of Missouri, Respondent,

v.

Glenn BERRY, Appellant.

No. WD 63648.

Missouri Court of Appeals,
Western District.

April 26, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 2005.

Application for Transfer Denied
Aug. 30, 2005.

Jeannie Marie Willibey, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Attorney General, Jefferson City, for respondent.

Before ROBERT G. ULRICH, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Glenn Berry appeals his conviction by a jury of second-degree murder, for which he was sentenced to thirty years' imprisonment. He contends that the trial court erred in admitting identification evidence that was obtained via impermissibly suggestive procedures. He also complains that the trial court should have intervened *sua sponte* with regard to improper argu-

ment. Finally, he complains as to the trial court's erroneous admission of hearsay evidence. The judgment is affirmed.

## Factual Background

Glenn Berry was convicted of second-degree murder in the death of his sixteen-year-old girlfriend, Carita Johnson. The death occurred in May 1998. The facts are recited in a light favorable to the verdict. *State v. Barriner*, 111 S.W.3d 396, 397 (Mo. banc 2003).

At trial, one of the witnesses was military police sergeant Richard Nero, who saw Berry assaulting a young woman in Kansas City shortly after midnight on the same night that Carita Johnson disappeared.

On that night, Sergeant Nero and his wife stopped at a stoplight at 47th and Troost in Kansas City and observed a couple fighting about thirty to forty feet away from the intersection. The man was holding the woman by her blouse and striking her in the face with his fist. Nero made a right turn onto Troost, then made a U-turn, and pulled up to the curb next to the couple. The area was well lighted. Nero got out of the car and walked up to the couple. The man who was striking the woman looked directly at Nero, made eye contact, and then ran off to the east. Nero and his wife tried to persuade the young woman to let them call the police or take her to the hospital. She said the man was her boyfriend and that he would return. Mr. and Mrs. Nero remained there for several minutes, then finally left. The Neros left Kansas City to move to North Carolina the next day.

Carita Johnson never came home. Her vehicle was found early that morning abandoned in the drive-through lane of a nearby fast-food restaurant.

About 7:00 a.m. the next morning, a patrol officer was flagged down by Berry, who seemed somewhat hysterical. Berry wished to report to the officer that he had been attacked and beaten by some men, who then drove off. Berry had some scratches on his face. He had a towel around his neck. He mentioned nothing about Carita Johnson. There was no indication that Berry needed emergency medical care. The officer took the report and left.

Shortly after Carita's disappearance, the police questioned Berry, photographs were taken, and evidence was collected, but no charges were filed. Berry had scratches on his face and his neck. Carita's family was suspicious of Berry's involvement in Carita's disappearance, but he assured them he knew nothing. Everything was fine with Carita, he said, when she left him at his house.

In September 1998, Sergeant Nero, who then knew nothing of the disappearance, saw a young woman pictured on a missing person poster and recognized her as the woman he had tried to help a few months earlier in Kansas City. The young woman on the poster was Carita. Nero contacted Kansas City police at that time, but no follow-up was done. Almost two years later, in February 2001, Nero contacted Kansas City police again about the case. Police made arrangements for him to come to Kansas City and view a photographic lineup. It was not until May 10, 2001, almost three years after the incident he had observed, that police actually showed him a lineup. At that time, he identified Berry "within two seconds" after being shown the six-person photo spread. Nero also identified a picture of Carita's car as the same purple car he had seen parked near the site of the altercation.

Initially, Berry denied any knowledge of Carita's murder. Later, however, Berry

provided information to the police about her death and took police to the location where he had buried her body. The police found Carita's skeletal remains inside a trash bag at the site. Due to the decomposition of the body, investigators were unable to determine what actually caused Carita's death. The cause of death was listed as "undetermined violence."

Berry gave a videotaped statement about the death. He stated that in the early morning hours of May 31, Carita drove him in her car to his house. He indicated that the two had been arguing and that when they got out of the car, Carita threw rocks at him. He stated that her death resulted from a blow to her head when he forcefully pushed her against a rock retaining wall. The next day, Berry gave another videotaped statement after being confronted with forensic evidence that contradicted his contention that the blow to her head killed her. He again indicated that Carita's death resulted from a fight between them. This time, though, he stated that while Carita was swinging her fists at him, he grabbed her around the neck with one hand to keep her distance from him and that her body eventually went limp. He stated that after she went limp, he forcefully pushed her against the rock retaining wall. He indicated in his statements that he tried repeatedly to revive her. He said that he thought of getting help for her, but never did because he was scared. Eventually, he said, he wrapped her body in garbage bags and buried her behind a nearby apartment building.

Berry did not concede being at 47th and Troost with Carita that night. Berry said they were at his house when the physical altercation began. Berry still does not concede that he and Carita were at 47th and Troost, where Sgt. Nero believes he observed them.

The State's evidence at trial indicated that Carita and Berry had a rocky relationship. Although Berry did not testify at trial in the guilt phase, his two videotaped statements were played for the jury, and the court admitted the transcripts as exhibits.

Nero testified as to what he had observed in 1998 at 47th and Troost. His testimony and descriptions at trial differed slightly from his earlier statements. He stated at trial, for example, that the young woman appeared to be fighting back. He also elaborated that when he got out of his car, he was within eight to ten feet of the man he later identified as Berry, and that he and his wife remained with Carita for twenty minutes before leaving. There were some minor variances in Nero's physical descriptions of the couple. Nero identified Berry in court. The State also introduced evidence of his out-of-court identification over objection.

During the opening portion of the State's closing argument, the assistant prosecutor told the jury: "... all of you have to agree that it's not murder second degree before you consider voluntary manslaughter and then if voluntary manslaughter is not something you all unanimously agree on, go then and only then down to involuntary manslaughter...." Defense counsel did not object to this statement of the law. The jury was instructed as to second degree murder as well as the two lesser offenses of voluntary manslaughter and involuntary manslaughter. The jury returned a guilty verdict on the second-degree murder charge.

During the sentencing phase of Berry's trial, additional evidence was presented to the jury. The jury ultimately assessed punishment at thirty years. This appeal follows.

## Point I: Identifications

In Berry's first point, he contends that the trial court erred in permitting, over objection, the identification evidence to be admitted at trial. He argues that the identifications were obtained through the use of impermissibly suggestive procedures and were thus unreliable.

The trial court's decision to admit identifications at trial is discretionary, and we will not disturb that decision unless we find an abuse of discretion. *State v. Chilton*, 119 S.W.3d 176, 177–78 (Mo.App. 2003).

Berry claims that the court clearly erred and abused its discretion in admitting the identifications at trial. "[T]he crucial test for admission of identification testimony is two-pronged: (1) was the pretrial identification procedure impermissibly suggestive, and (2) if so, what impact did the suggestive procedure have upon the reliability of the identification made by the witness." *State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. banc 1989). To prevail on this point, Berry must prove that the procedures employed by the police were impermissibly suggestive, and, then, that the suggestive procedures made the identifications unreliable. *State v. Vinson*, 800 S.W.2d 444, 446 (Mo. banc 1990). "A pretrial identification procedure is unduly suggestive if the identification results not from the witness' recall of firsthand observations, but [ ] from the procedures or actions employed by the police." *State v. Glover*, 951 S.W.2d 359, 362 (Mo. App.1997). Although "reliability is the linch-pin in determining the admissibility of identification testimony," Berry must show that there was a problem with the degree of suggestiveness before obtaining a reliability review. *See Vinson*, 800 S.W.2d at 446 (*quoting Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). "Identification testi-mony will be excluded only when the procedure was so suggestive that it gave rise to a very substantial likelihood of irreparable misidentification." *Hornbuckle*, 769 S.W.2d at 93. Where the defendant fails to establish that the procedures were unduly suggestive, the factors considered in the reliability prong of the test "go to the weight of the identifications and not to their admissibility." *Vinson*, 800 S.W.2d at 446.

Berry is concerned about the identification testimony even though he gave a videotaped statement admitting involvement in the killing because his defense was based on a theory of self-defense or accidental killing. Because Berry believes that Nero's testimony as to the beating of Carita was prejudicial to his defense, he seeks a ruling that such evidence should have been excluded.

Berry says the following circumstances created an impermissibly suggestive procedure. He points out that the police failed to show the photo spread to Nero until almost three years after the event. He also argues that the dates on the photographs were suggestive in that two photos (one of which depicted him) were more recent. He states that of those two more recent photos, the one of Berry most closely matched Nero's description of the assailant in that it shows him with a longer afro hairstyle. He says that police had other photographs of him taken immediately after Carita's disappearance in which he had a close-cut afro. The combination of these circumstances, Berry argues, created an impermissibly suggestive procedure. Therefore, he says, there was a high likelihood of misidentification and a high probability that Berry's photograph would be selected.

Berry points us to no cases in which such circumstances were found to have

constituted impermissibly suggestive procedures. Defense counsel did not object to the photographs on this specific basis (*i.e.,* the dates) either at the pre-trial suppression hearing or when Nero testified about them at trial. The delay in showing the photo spread to Nero does not relate to suggestibility. It may relate to the issue of the reliability of the identification, which would go to weight and not to admissibility. *Vinson,* 800 S.W.2d at 446. The State argues that the dates on the photos are irrelevant because Nero identified Berry within *two seconds* of being shown the photo spread and, therefore, did not have time to consider the dates in relation to the date of the crime.

Regardless of how quickly Nero identified Berry, we note that the dates on the photographs are inconspicuous. It is not clear that the average viewer would recognize them as dates at all, as opposed to merely a series of numbers. Even if we were to assume that Sgt. Nero, as a military policeman, recognized the numbers as dates, we fail to see that the dates were suggestive of anything in this context. We fail to understand Berry's argument that the fact that Berry's picture was one of the more recent photos was somehow suggestive. We have no particular grounds to believe that the numbers on the photos would have played into the identification one way or another. We also agree with the State's observation that *all* of the men in the photo spread had longer hair. Berry fails to show that the procedures employed qualified as unduly or impermissibly suggestive.

Berry has failed to show that the identifications were the product of impermissibly suggestive procedures. Point denied.

### Point II: Prosecutor's Misstatement of the Law

■ Second, Berry argues that the trial court plainly erred in allowing the prosecutor to misstate the law regarding the procedures for the jury to follow before considering two lesser-included offenses and in failing, *sua sponte,* to declare a mistrial or to correct the error.

■ During the opening portion of the State's closing argument, the assistant prosecutor misstated the law by informing the jury: "... all of you have to agree that it's not Murder Second Degree before you consider voluntary manslaughter and then if voluntary manslaughter is something that you all unanimously do not agree on, you go then and only then down to involuntary manslaughter...." In actuality, the jurors could consider the lesser charge if they could not agree as to second-degree murder. *State v. Wise,* 879 S.W.2d 494, 517 (Mo. banc 1994). "Missouri juries do not have to find a defendant 'not guilty' of the greater offense before considering the lesser included offense. Instead, ... Missouri juries are allowed to consider the lesser included offense if they 'do not find the defendant guilty' of the greater offense." *Id.* In other words, a jury deadlocked on the greater offense has not found the defendant guilty, and can, therefore, consider the lesser included offense. *Id.* The State here concedes that the prosecution misstated the law. Defense counsel did not object to this misstatement of the law.

At the close of all the evidence, the jury was properly instructed with regard to second-degree murder and the two lesser offenses of voluntary manslaughter and involuntary manslaughter. After deliberating for four hours, the jury returned a guilty verdict on the charge of second-degree murder.

■ Because there was no objection to the prosecutor's misstatement at trial, Berry requests review of the claim

for plain error. A claim not properly preserved for appellate review may be considered for plain error at our discretion. Rule 30.20; *see also State v. Wurtzberger*, 40 S.W.3d 893, 897–98 (Mo. banc 2001). Under this standard, we will not reverse unless the error was plain error affecting a substantial right and resulting in manifest injustice or miscarriage of justice. Rule 30.20. Plain error review is to be used sparingly. *State v. Knese*, 985 S.W.2d 759, 770 (Mo. banc 1999). The defendant bears the burden of demonstrating manifest injustice or a miscarriage of justice. *State v. Tokar*, 918 S.W.2d 753, 770 (Mo. banc 1996).

Berry acknowledges that the jury instructions were properly drawn. Despite this, he argues, based upon the prosecutor's misstatement of the law, that the jury necessarily would have been coerced into voting for the greater offense without giving due consideration to the lesser-included offenses. The jurors, he reasons, by following the prosecutor's misstatement, would have understood the instructions to mean that they had to unanimously agree to acquit of second-degree murder before they could even consider either manslaughter charge. He says the misstatement would have caused the jury, even if deadlocked on the second-degree murder charge, to remain there without considering the lesser offenses. Berry argues that

such a gross misstatement of the law created a need for the court, *sua sponte*, to declare a mistrial. Berry asserts that he was prejudiced by the trial court's plain error in failing to declare a mistrial because the lesser-included offenses constituted his entire defense.

▉ The State argues that even if the prosecutor's statement was a misstatement of the law, the jury was nevertheless properly instructed with regard to the lesser-included offenses. Thus, says the State, there was no plain error affecting substantial rights and resulting in a potential miscarriage of justice. According to the State, the combination of the three jury instructions for second-degree murder and the two lesser charges informed the jury that if they *did not find the defendant guilty* of the greater offense, they must consider the lesser offenses.[1] Taken as a whole, the State says, the court properly instructed the jury on the law and thus cured any misstatement of the law. Where a prosecutor misstates the law but the jury is properly instructed, the State points out, the jury is presumed to have followed the instructions. *See, e.g., State v. Graham*, 916 S.W.2d 434, 436 (Mo.App. 1996) (misstatement that one juror could free the defendant found not prejudicial because jury properly instructed); *State v.*

---

1. The first of the pertinent jury instructions, Instruction 5, instructed as to the elements of second-degree murder. It concludes: "However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of *murder in the second degree.*"

 Instruction 6 begins, then: *"If you do not find the defendant guilty of murder in the second degree,* you *must consider* whether he is guilty of *voluntary manslaughter."* It also concludes with: "However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these proposi-

tions, you must find the defendant not guilty of *voluntary manslaughter."*

 Instruction 8 begins: *"If you do not find the defendant guilty of murder in the second degree or voluntary manslaughter,* you *must consider* whether he is guilty of *involuntary manslaughter* in the first degree." It concludes with the same "unless you find and believe from the evidence beyond a reasonable doubt" language as in Instructions 5 and 6.

 Instructions 7 and 9 were converse instructions submitted by the defendant, stating simply, "If you have a reasonable doubt ..., you must find the defendant not guilty of [the applicable charge]."

*Blakeburn*, 859 S.W.2d 170, 174–75 (Mo. App.1993) (misstatement of law regarding the presumption of innocence found not prejudicial because proper jury instruction given). There was no call for the court to declare a mistrial, the State says.

 It is well settled that a mistrial is considered a "drastic remedy [that should be] reserved for extraordinary circumstances," and the decision to declare one rests within the sound discretion of the trial court. *State v. Johnson*, 22 S.W.3d 183, 191 (Mo. banc 2000). Improper comments made by the State during closing argument that are not preserved by a timely objection can only be reviewed for plain error pursuant to Rule 30.20. *State v. Payne*, 126 S.W.3d 431, 444 (Mo.App. 2004). "Plain" error is error that is evident, obvious, and clear. *State v. Houston*, 139 S.W.3d 223, 227 (Mo.App.2004). Under plain error review, the appellate court first must determine, in effect, whether on the face of the claim "plain error" has in fact occurred. *State v. Brown*, 97 S.W.3d 97, 100 (Mo.App.2002).

 Relief is rarely granted on assertions of plain error committed during closing argument due to trial strategy considerations. *State v. Kinder*, 942 S.W.2d 313, 329 (Mo. banc 1996). It is not always clear which side benefits the most from a misstatement of law. This case is an example. If defense counsel noticed the misstatement but decided, for strategic reasons, not to object, relief should not be granted on plain error review. To reverse for plain error on such a claim, we must find not only that the argument was improper, but that it had a decisive effect on the trial's outcome and that it amounts to a manifest injustice or miscarriage of justice if left uncorrected. *State v. Anderson*, 79 S.W.3d 420, 439 (Mo. banc 2002).

If we were to assume that, despite the fact that the court gave the correct instruction, the jury accepted the prosecutor's erroneous statement, the circumstance for the jury would have been the same as if the jury had been given only one charge to consider. Thus, if the jury were not unanimous as to the decision on second degree murder, the jury would have deadlocked without ever considering the lesser offenses. There is no reason to believe the jury first deadlocked and then decided to resolve the deadlock by convicting him of the major offense. If there was any doubt as to Berry's guilt of the major offense, the jury could have decided to unanimously acquit of the major charge and move to consideration of a lesser charge. Because the jury did not do so, it is speculative to suggest that the jury had any doubt as to the major charge.

Berry notes that after four hours of deliberations, the jury asked for clarification of the phrase "was aware that the conduct was practically certain to cause the death of" and requested to view Berry's videotaped confessions. Berry suggests that this fact supports his argument. It appears more logical, however, that such fact shows that the jury was willing to simultaneously consider all the charges, which is the exact opposite of his argument.

To believe that the jury was essentially coerced into convicting Berry of second-degree murder for the very reason that it was not unanimous on guilt *or* innocence is unreasonably speculative. *Cf. State v. Graham*, 916 S.W.2d at 436 ("It is speculative to conclude the misstatement of procedural law caused any juror to reach a guilty verdict. If that occurred, then the juror must have failed to follow the instructions of the court."). It is more likely the jury actually followed the court's written instructions. It is also more likely, even if the jury were misled by the argument, that the jurors would have felt

coerced to *acquit* of second-degree murder, rather than having felt coerced to *convict*. Indeed, the prosecution's misstatement of the law could, if followed, have had a tendency to work in Berry's favor. The failure of the defense to object to the errant statement by the prosecutor could have been a strategic decision, based on a belief that the incorrect argument would work to the defendant's benefit. We will not reverse on plain error in a case where there is reason to believe there was no harm to the defendant. Point denied.

### Point III: Admission of Hearsay at Sentencing

■ In his final point, Berry argues that the trial court erred in permitting the admission of hearsay evidence at the sentencing phase of the trial. He claims that the admission of the hearsay evidence violated his Sixth Amendment right to confront the witness and that he was prejudiced because the evidence inflamed the passions of the jurors against him, causing them to assess a greater punishment than they otherwise would have.

■ The trial court is vested with broad discretion in admitting or excluding evidence, and those decisions will not be disturbed unless there is a clear abuse of that discretion. *State v. McKibben*, 998 S.W.2d 55, 58 (Mo.App.1999). We will find an abuse of discretion only where a trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Neff*, 978 S.W.2d 341, 345 (Mo. banc 1998). We review a trial court's decision regarding the admissibility of evidence for prejudice, not mere error. *State v. Mozee*, 112 S.W.3d 102, 105 (Mo.App. 2003).

Section 557.036, as amended in 2003, provides for criminal trials to be bifurcated, or conducted in two stages: a guilt phase and a penalty phase. Both phases are to be heard by a jury in most cases. *But see* § 557.036.4. A wide range of evidence is admissible in the penalty phase, including victim impact evidence, the nature and circumstances of the offense, and the history and character of the defendant. *See* § 557.036.3, RSMo Cum.Supp.2004.

During the sentencing phase of Berry's trial, the State introduced the testimony of four police officers, all of whom testified about instances in which they talked with Carita Johnson. Two of the officers, Officer Volker and Officer Whitaker, each testified as to their response to a police report by Carita that Berry had hit her. Officer Volker testified that Carita told him on one occasion that she and Berry had argued, Berry hit her face, knocking her down, and then took her shoe and left. The second officer, Officer Whitaker, testified that Carita told him that when she and Berry were both at work at a local fast food restaurant, they had a fight. She said he punched her, which knocked her down, and then kicked her when she was on the ground. The officer said Carita had a bruise over her right eye, but no other signs of injury. He said she was crying and talking very fast.

A third officer, Officer Growney, who was summoned to the scene when Berry jumped out of a moving car, testified that Carita told him that she and Berry had been arguing. Carita said that Berry jumped out of her moving vehicle after she told him that she did not want to be with someone who was mentally unstable. Berry, who was still sitting on the street and was somewhat shaken up, told the officer he did not know what happened. A fourth officer, Officer Stanze, testified that on another occasion Carita told him that she

and Berry had been in her car, that they had an argument and started struggling over keys, and that Berry obtained some of the keys and then left.

In each instance, defense counsel objected on grounds of the inadmissibility of hearsay. The defense also objected on the ground that the evidence violated Berry's constitutional right to confront witnesses. The prosecution attempted to defend the testimony on the basis that it was "not being offered for the truth of the matter asserted," but rather to "establish the history" of the couple's relationship. The court overruled defendant's objections.

Relying on *Idaho v. Wright*, 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), Berry asserts that "[n]on-testimonial hearsay evidence may be admissible [only] if it falls within a firmly-rooted exception to the hearsay rule or is supported by particularized guarantees of trustworthiness." Berry says that the hearsay testimony of the four police officers clearly was offered for the truth of the matters asserted therein (*i.e.*, that Berry had abused the victim before and was mentally unstable) and did not fall within any exception to the general rule prohibiting admission of hearsay evidence. He claims that he was prejudiced by the admission because the evidence was extremely inflammatory and encouraged the jury to increase the amount of his punishment.

The State, arguing that the court did not abuse its discretion in admitting this evidence, even if it was offered for the truth of it, points out that in the penalty phase here, unlike in a capital case,[2] the jury is not required to make any specific findings beyond a reasonable doubt in determining the defendant's sentence. *See State v.*

*Jaco*, 156 S.W.3d 775, 780–81 (Mo. banc 2005) (at section 557.036 penalty phase hearing, jury not required to find facts beyond a reasonable doubt to impose a sentence that is within an unenhanced range of punishment). Because there is no requirement of proof beyond a reasonable doubt, the State reasons, hearsay evidence may be admitted in this type of penalty phase hearing without violating the defendant's due process rights. The State likens this sentencing hearing to a probation revocation hearing, where less due process is afforded.

Next, the State argues that even if the Sixth Amendment right to confront witnesses applies to a non-capital penalty phase hearing, that amendment is not implicated here because this hearsay was "non-testimonial," unlike testimony that occurred in a prior trial or deposition. Citing the recent decision of the United States Supreme Court on the right of confrontation, *Crawford v. Washington*, 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the State concludes that admission of "non-testimonial" hearsay statements does not violate a defendant's Sixth Amendment right to confront witnesses.

There is ample doubt and confusion about the application of the Sixth Amendment in this context. *See, e.g., Lilly v. Virginia*, 527 U.S. 116, 140–43, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (Breyer, J., concurring); *Crawford*, 541 U.S. at 69–76, 124 S.Ct. 1354 (Rehnquist, C.J., concurring, with whom O'Connor, J., joined).

In *Crawford*, the defendant was charged with first-degree assault after he stabbed a man who allegedly tried to rape his wife. The defendant and his wife, who was pres-

---

**2.** *See* § 565.030.4, RSMo 2000, which specifically provides that evidence presented in aggravation and mitigation of punishment in a capital case is "subject to the rules of evidence at criminal trials" and that evidence of aggravating factors must be found beyond a reasonable doubt.

ent at the time of the stabbing, gave separate interviews to police. 541 U.S. at 38–40, 124 S.Ct. 1354. The wife's account of the altercation differed from her husband's, particularly in regard to his denial that the man had drawn a weapon before her husband stabbed him. The wife refused to testify at her husband's trial on grounds of marital privilege. The State introduced, over objection, the tape recorded statement the wife made to interrogators. Defendant was convicted. *Id.* at 40–41, 124 S.Ct. 1354. Ultimately, after reversal and reinstatement in the state court system, the U.S. Supreme Court granted certiorari to consider whether the state's use of the wife's statement violated the Confrontation Clause. *Id.* at 42, 124 S.Ct. 1354. The court held that it did. *Id.* at 68–69, 124 S.Ct. 1354. Central to the court's holding was a recognition that the formality of wife's statement to interrogators was such that it was "testimonial" in nature. *Id.* at 61, 124 S.Ct. 1354.

Berry has no case in point involving similar non-testimonial out-of-court victim statements made to a police officer. The few cases we have located have not noted a Sixth Amendment violation in a similar context, whether in the *guilt* phase of the trial or the *sentencing* phase.

For instance, in *State v. Beam,* 206 Neb. 248, 292 N.W.2d 302 (1980), the defendant was charged with murdering his wife. A deputy sheriff testified at trial that, two days before the wife was killed, the deputy found the defendant's wife in a truck in a church parking lot in the middle of the night. The wife said she was afraid to return to her residence because her husband had beat her up in a fight. The deputy arranged for her to get a room at a motel. *Id.* at 304. When the deputy presented his testimony at trial, the defense objected on grounds of hearsay. The court allowed the testimony under the "residual hearsay exception" of Rule 804(b)(5), finding the statements to be sufficiently reliable to warrant admission. *Id.* at 306. Thus, in *Beam,* not only was there no concern about violating the right of confrontation, but the evidence was held to be admissible under a "residual" exception to the hearsay rule.[3]

Even in other cases where similar out-of-court statements made by the victim to police officers were held to be inadmissible and prejudicial hearsay in the guilt phase of a trial, the grounds of reversal were not related to a violation of the right of confrontation. *See, e.g., State v. Revelle,* 957 S.W.2d 428 (Mo.App.1997) (in prosecution for murder of wife, wife's earlier handwritten note concerning the status of the marriage was held to be inadmissible and prejudicial hearsay); *State v. Hollingsworth,* 78 N.C.App. 578, 337 S.E.2d 674 (1985) (defendant accused of assaulting his mother; mother had no memory of the subject matter of her earlier statements; mother also had recanted earlier statements prior to trial); *State v. Apperson,* 85 Or.App. 429, 736 P.2d 1026 (1987) (out-of-court statements made by assault victim to police officer were found non-reliable because there was evidence the victim had been

---

**3.** The Federal Rules of Evidence and some states have a "residual" exception, under which statements not specifically covered by codified exceptions to the hearsay rule still may be admissible. The Federal residual exception provides that such a statement, if it has "equivalent circumstantial guarantees of trustworthiness," is not excluded by the hearsay rule, if the court determines that it is offered as evidence of a material fact, that it is more probative on the point for which it is offered than any other evidence the proponent can reasonably procure, and that the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement. *See* Fed. Rules of Evid., Rule 807, formerly Rules 803(24) and 804(b)(5).

angry with the defendant because the defendant had been seeing defendant's ex-wife; held inadmissible). In those cases, reversal was based on the fact that the out-of-court statements were inadmissible and prejudicial hearsay. Berry lacks authority as to any case reversing a conviction on Sixth Amendment grounds.

Here, the comments that Carita made to the police were written down by officers in the course of their duties. The officers had at that time no apparent bias or reason to amplify or exaggerate Carita's remarks. Carita's remarks were not "testimonial" in the sense that they were not solemn proceedings, as in a deposition or a formal interrogation. However, because Carita was deceased, Berry could not cross-examine her as to whether she was lying or exaggerating or had somehow misperceived or misunderstood Berry's actions. Thus, at least some of the significant dangers associated with hearsay evidence were present.

It appears that the statements *were* offered to prove the truth of the matters asserted—that Berry had hit Carita at least twice before, and that he was volatile and unstable. The State argued at trial that the statements were not offered for the truth of the facts asserted by Carita, but were offered essentially to show the turbulent "nature of the relationship." That prompts the question, of course, as to the relevance of knowing, for sentencing purposes, as an abstract proposition, that the relationship was turbulent. Is it not true that the turbulence is material to sentencing only if Berry were a significant factor in the turbulence? Thus, we believe the State was actually offering the evidence to show that Berry was erratic and prone to violence. The statements were designed more to reveal certain things about Berry's character than they were to make abstract assertions about the relationship.

The prosecution did not argue at trial that the statements fit within a specific exception to the hearsay rule, and the State does not so argue now. It might have been arguable that the two statements about Carita being hit by Berry were admissible as excited utterances.[4] However, the State does not argue such an exception nor any other exception.[5]

We have no substantial reason to believe that hearsay evidence (an out-of-court statement that does not qualify under an exception) should generally be admitted in the sentencing phase under section 557.036. It is true that traditionally, in cases of judge sentencing as opposed to jury sentencing, hearsay is routinely permitted in the form of pre-sentencing investigations and in other ways. However, we note that in the punishment phase of capital cases under section 565.030, hearsay evidence has frequently been excluded.

4. In the case of the two statements in which Carita accused Berry of assaulting her, she was, according to the officers, distraught, crying, and talking very fast. However, we have no knowledge of the time lapse between the alleged incident and the report to officers; we cannot say the statements should have been admitted on that basis.

5. In the case of the statement involving Berry's act of jumping from the car, it appears that Berry was present with Carita at the time the officer arrived at the scene. The statement thus could have been treated, perhaps, as an admission, depending on whether Berry overheard Carita's statement to the officer. The officer said Berry did not have serious injuries, but was "shaken up" as a result of jumping from the car, and was taken to the hospital for "minor stuff." Berry may have been sufficiently alert to have denied Carita's assertions at the time if her comments were made in his presence. Again, because the factual record is sparse, we do not know that such statement should have been admitted, on the basis of being an admission of a party.

*See, e.g., State v. Glass*, 136 S.W.3d 496, 519 (Mo. banc 2004). This is because juries have more difficulty than judges in recognizing the dangers of relying on hearsay statements. The rules of evidence were developed for jury trials. *See Revelle*, 957 S.W.2d at 434 (Shrum, J., concurring) (*citing 1 Wigmore, Evidence*, §§ 4, 4b (Tiller's rev.1983)).

█ Accordingly, we believe that in a jury trial, whether involving a determination of guilt or a sentencing proceeding under section 557.036, hearsay that does not qualify under an exception to the rule should be excluded, as it would be in any other jury proceeding. We recognize that the State's argument that the evidence was offered to show the "nature of the relationship" sounded plausible at the time to the scholarly trial court. However, we conclude that, despite the State's assertion that the evidence was not offered for the truth of it, it was an abuse of discretion in this case for the court to receive the hearsay evidence over specific, thorough and repeated objection.

█ We turn now to a consideration of whether the admission of hearsay statements in the sentencing phase was prejudicial. In this regard, we note the following factors:

· The jury had already determined that Berry murdered Carita and had already been afforded a taste of Berry's violent propensities in the guilt phase. Sergeant Nero testified that Berry had physically assaulted Carita earlier on the night of the murder by holding her blouse and hitting her in the face with his fist. The jury had also seen the extensive videotaped statements of Berry given to police.

· There was also testimony in the guilt phase that Berry was jealous and occasionally made a "big scene" and that he had harassed Carita and threatened to kill her. Carita's mother testified in the guilt phase that Carita had to change her place of employment to avoid Berry's harassment.

· In the sentencing phase, Carita's mother testified that on one occasion when Carita refused to see Berry, Berry tried to break through the door to Carita's house, and, when he could not do so, then intentionally broke her bedroom window before he left.

· When Berry testified at the sentencing proceeding, he admitted being rough with Carita, including tripping her on purpose to make her fall (although he denied bruising her). Berry also admitted arguing over the car keys (which he said was due to the fact that he did not want Carita driving because she was drunk) and taking some of her keys. He also admitted jumping out of the moving car. He did not disclose his reason for jumping out of the moving car because he did not want to make Carita "look bad."

· Berry acknowledged he tried to be "in control" of Carita and that "a lot of people" said he was "kind of controlling." He said it was "more of like a father figure type of control."

· Accusations were presented by Berry's former girlfriend (and the mother of his child) that Berry was violent to her. She said that he had punched her in the back of the head on numerous occasions. She testified that once when he was very angry, he choked her, and that it took physical intervention by two friends to get him off her and make him leave. She also testified that Berry had hit her "all over her body" on several occasions.

· Two of the four out-of-court statements of Carita did not involve accusations that Berry struck Carita. Also, in only one case was there an observable injury to

Carita; that was a bruise on her face, observed by Officer Whitaker. One of the other statements showed that Berry jumped out of a moving car, which Berry himself did not deny. The other was a fight over car keys (which Berry also admitted) but did not involve an allegation that Berry hit anyone.

· Berry testified in his own behalf in the sentencing phase. Even if the trial court had rejected the hearsay evidence on that basis, because Berry testified in his own behalf, the prosecutor, in cross-examination, would have had a good faith basis to question Berry about the prior incidents with Carita. The incidents were logically relevant to sentencing. If asked about them, Berry would have been forced to deny that such incidents occurred or to admit them and discuss them. Neither option would have been particularly desirable. The defense makes no argument that Berry would not have testified in his own behalf in the sentencing phase had it not been for the hearsay evidence introduced in the State's portion of the sentencing phase. In other words, there is no argument that the hearsay evidence forced the defense to change its strategy.

· It appears that the accusations likely would have surfaced and created some difficulty for Berry, regardless of whether it was on cross-examination or in the State's portion of the case. If the State had not offered the hearsay in its portion of the sentencing case, the jury still would have heard a significant amount about Berry's erratic and violent tendencies.

· Even without Carita's out-of-court statements, there was overwhelming evidence Berry was a young man lacking self-control and easily provoked to violence against women. His own testimony seemed to lack perspective in this regard, even as to the violent actions he acknowledged.[6]

Because the jury had already determined that Berry murdered Carita, and because the jury had abundant other evidence of Berry's temperament, it is difficult to accept the notion that Berry received a more severe sentence because of the admission of Carita's out-of-court statements than he would have otherwise. Consequently, in this case involving an obviously troubled young man, we see no prejudice from the erroneous admission of Carita's statements. Point III is denied.

Judgment is affirmed.

ULRICH and ELLIS, JJ., concur.

---

6. In his testimony in the sentencing phase, he was willing to admit some of his violent actions, but he offered as justification the fact that Carita threatened him or was, he thought, getting ready to assault him.