STATE of Missouri, Respondent,

v.

Cecil BARRINER, Appellant.

No. WD 65092.

Missouri Court of Appeals,
Western District.

Oct. 24, 2006.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 19, 2006.

Application for Transfer Denied
Jan. 30, 2007.

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa Michelle Kennedy, Assistant Attorney General, Jefferson City, MO, for Respondent.

Craig A. Johnston, Assistant State Public Defender, Columbia, MO, for Appellant.

Before EDWIN H. SMITH, C.J., and HOWARD and NEWTON, JJ.

EDWIN H. SMITH, Chief Judge.

Cecil Barriner appeals the judgment of his convictions, after a jury trial in the Circuit Court of Callaway County, of two counts of first-degree murder, in violation of § 565.020.[1] The appellant was convicted of murdering Candace Sisk (Candy) and her grandmother Irene Sisk (Irene). As a result of his convictions, the appellant was sentenced to consecutive terms of life imprisonment in the Missouri Department of Corrections, without the possibility of probation or parole, pursuant to § 558.011.

The appellant raises four points on appeal. In Point I, he claims that the trial court erred in allowing, over his objection, the testimony of the State's witness, Debbie Dubois, regarding a telephone conversation she had with one of the victims, her niece, Candy, on the morning of the murders, because it was hearsay offered to prove the truth of the matters asserted, that unexpectedly, on the morning of the murders, a man appeared at the home of the victims, who was acting strangely and told Irene that he had a gift for Candy from her mother, who was in prison, causing Candy to be afraid, and no hearsay exception applied for its admission. In Point II, he claims that the trial court erred in overruling his motion to suppress and allowing at trial, over his objection, the State's witness, Kristie Strickland Evans, a bank teller at a bank in Risco, to identify him in court as the man she saw at the bank with Candy on the morning of the murders, withdrawing money from her account, because the "State did not show by clear and convincing evidence that there was a reliable independent basis for [her] identification," rendering it inadmissible as being "unreliable and impermissibly suggestive." In Point III, he claims that the trial court erred in overruling his motion to dismiss and allowing his case to proceed to a third trial, his prior convictions for murder, as to the same victims,

---

1. All statutory references are to RSMo, 2000, unless otherwise indicated.

having been reversed by the Missouri Supreme Court in *State v. Barriner*, 34 S.W.3d 139 (Mo. *banc* 2000) (*Barriner I*), and *State v. Barriner*, 111 S.W.3d 396 (Mo. *banc* 2003) (*Barriner II*), because his Fifth Amendment right to be free from double jeopardy was violated by the prosecutor's misconduct in his prior trials in failing to disclose exculpatory evidence concerning the failure of Evans to identify the appellant from a police photo lineup. In Point IV, he claims that the trial court erred in overruling his motion to suppress and admitting at trial, over his objection, his oral confession, because under the totality of the circumstances, it was involuntary due to its being coerced by Steve Hinesly of the Missouri State Highway Patrol and being made while he was under the influence of methamphetamine.

We affirm.

### Facts

In *Barriner I*, the appellant was charged in the Circuit Court of New Madrid County with two counts of first-degree murder, in violation of § 565.020, for the murders on December 16, 1996, of Candy and Irene. 34 S.W.3d at 144. On a change of venue to Dent County, the appellant's case proceeded to a jury trial. *Id.* The jury found him guilty on both counts, and the trial court sentenced him to death on both counts. *Id.* On direct appeal, the Missouri Supreme Court reversed his convictions and remanded his case to the trial court. *Id.* at 153.

On remand, in *Barriner II*, the appellant's case again proceeded to a jury trial on a change of venue to Warren County. 111 S.W.3d at 396. The appellant was again found guilty on both counts and was

sentenced to death on both counts. *Id.* at 397. On direct appeal, the Supreme Court again reversed his convictions and remanded his case to the trial court. *Id.* at 401.

On remand, the appellant's case again proceeded to a jury trial, this time on a change of venue to Callaway County. Although the change of venue was to Callaway County, the trial was actually held in the Boone County Courthouse. Trial commenced on November 9, 2004. For the third time, the appellant was convicted on both counts of murder in the first degree.

In a light most favorable to the jury's guilty verdicts in this case, the underlying facts are as follows, *State v. Tisius*, 92 S.W.3d 751, 757 (Mo. *banc* 2002):

The appellant had an on-again, off-again relationship with Candy's mother and Irene's daughter, Shirley Niswonger (Shirley) from 1993 to 1996. During his relationship with Shirley, the appellant became acquainted with Candy and was aware of Irene. He accompanied Shirley on several occasions when she borrowed money from her parents. He believed them to be wealthy.

At the time of their murders, on December 16, 1996, Candy and Irene were living together in Irene's home in Tallapoosa, New Madrid County, Missouri. Irene's husband, Obie, was deceased. Shirley was in prison serving a sentence for possession of a controlled substance, and the appellant, who was on parole,[2] was living with his brother, Belvi Barriner, nicknamed Will, in Poplar Bluff, Butler County, Missouri. The appellant stayed in contact with Shirley, while she was in prison, by telephone and mail until November 1996.

---

**2.** The record indicates that the appellant alternated in his testimony as to his being on "parole" or "probation." It is impossible to tell from the record on appeal which actually

was the case. However, inasmuch as this distinction in terms is not critical to our analysis, we will simply reference his being on "parole."

In December of 1996, the appellant was concerned that he had failed a urine test, required as a condition of his parole, and that his parole would be revoked. As a result, he decided to leave town. Needing money and believing that the victims were wealthy, he decided to get the money from them.

On December 15, 1996, the appellant visited his friends, Daniel and Samantha Simmons, who lived in Malden, Missouri, only a few miles from the victims' residence. He was driving a white Ford Taurus, which belonged to his parents. On occasion, the appellant used methamphetamine with Daniel. At some point, he asked the Simmonses if they wanted to ride with him to check the air pressure in his tires. While at the gas station, the appellant told them that he did not have any money, but that some people in Tallapoosa owed him money. They then accompanied him to Tallapoosa, where they drove by the victims' residence two or three times. He told the Simmonses that the victims' home was where the people lived who owed him money. Samantha noticed that while they were riding around, the appellant was holding and playing with a Crown Royal bag that contained something other than a bottle.

On December 16, 1996, shortly after 8:00 a.m., a neighbor of the victims saw a medium-size white vehicle, driven by a male, driving slowly in front of the victims' residence. At approximately 8:45 a.m., Candy telephoned her aunt, Debbie Dubois (Dubois), who worked for the Risco R–II School District. Risco is a small town located only a few miles from Tallapoosa. Candy told Dubois that a man had been at their house a short time earlier, acting strangely, and had told Irene that he had a Christmas gift for Candy from her mother. Candy told her that she was scared because she knew her mother was mad at

her for not giving her money she had wanted. Dubois tried to calm her down by assuring her that her mother would not do anything to hurt her or to have her hurt. As promised to Candy, she tried to contact a relative to check on the victims, but was unsuccessful. Dubois called Candy back and instructed her to telephone her if the man returned.

Shortly after 9:00 a.m., a man driving a white Ford Taurus drove up to the drive-through window at a bank in Risco. The bank teller, Kristie Evans (Evans), whose last name was Strickland at the time, recognized Candy as the passenger in the front seat. Candy was dressed in a nightgown, with a blanket over her legs. She also observed that there was a passenger in the backseat, who was only visible from the elbow down. The backseat passenger appeared to be female and was patting Candy. The man presented a check for $1,000, signed by Candy and drawn on her account, and told Evans that he wanted $100 of the money in $20 bills. Evans obliged, giving the man the money in nine $100 bills and five $20 bills.

At approximately 11:00 a.m., Dubois made several attempts to reach the victims by telephone, but was unsuccessful. Finding it unusual that she received no answer, since they had an answering machine, and Candy had recently undergone back surgery and was not supposed to leave the house for six weeks, she went to check on them, only to find them both dead. She found Candy's body lying on the bed in her bedroom. Her hands were bound in front with rope, and she was unclothed from the waist down. She had a butcher knife sticking out of her chest. Irene's body was found on the floor of her bedroom, next to her bed. Her wrists and ankles were bound with rope. Dubois tried to call the police to report the murders, but the telephones in the living room were

missing, so she went to a nearby store and called her brother. The police were then notified.

Autopsies were performed on the victims' bodies. Candy's autopsy revealed that she had multiple knife wounds and cuts to the neck, one of which severed her left jugular vein, from which she bled to death. At or near her time of death, it was determined that Candy was vaginally and anally violated, causing severe lacerations. She also had a bite mark on her left breast. As to Irene, it appeared that her mouth and nose had been covered with duct tape that had been ripped off. She suffered multiple superficial stab wounds in the area of her left chest, which were inflicted roughly fifty to sixty minutes before her death. Her death resulted from her neck having been slashed at least three times.

During the crime scene investigation, the police found the purses of the victims open near their bodies. They also found two checkbooks next to Irene's purse on her bed. In one of those checkbooks, they found an unsigned check for $1,000, made out to "Cash." An empty videotape box or sleeve for the movie "Independence Day" was found where a missing VCR had been. Three telephones were found missing or disabled.

The investigation also revealed smears of blood on a utensil drawer in the kitchen, on a knife inside the drawer, and on the handle to the back door to the house. DNA analysis established that the blood on the utensil drawer was consistent with Irene's DNA profile. The butcher knife found in Candy's chest appeared to match the set of knives found in the utensil drawer.

Only a few hours after the murders, the appellant registered at the Tower Motel in Poplar Bluff, Missouri. When he registered, he appeared to the clerk at the desk to be a "little nervous." He paid with a $100 bill and told the clerk that he "just wanted to get away from everybody." Later that same day, around 6:00 p.m., he gave an acquaintance, Kevin Dennis (Dennis), who repaired electronic equipment, a used VCR for parts. He told Dennis that he got the VCR out of somebody's trash.

On December 18, 1996, two days after the murders, the appellant was contacted at his brother's home by Steve Hinesly (Hinesly) of the Missouri State Highway Patrol and Scott Johnston of the Butler County Sheriff's Department. When advised of why they were there, the appellant asked, "Candy's dead?" The appellant was asked to accompany them to Patrol Headquarters in Poplar Bluff, which he agreed to do. Hinesly knew that there was an outstanding warrant for the appellant on a non-related burglary charge and intended to arrest him as soon as they arrived at headquarters.

Once at headquarters, the appellant was arrested and *Mirandized.* The appellant waived his rights in writing and agreed to talk with Hinesly about the murders. When asked, the appellant denied killing the victims. He claimed that at the time of the murders he had been traveling to Cape Girardeau and two other towns. When Hinesly challenged the fact that the appellant could travel such distances in one day, he changed his story and told Hinesly that on the day of the murder he had used methamphetamine at the home of Dennis. When contacted, Dennis denied that he saw the appellant on the morning of the murders. Rather, he stated that he saw him that evening, between 5:00 and 6:00 p.m. when he gave him the used VCR that he said he had gotten out of the trash. Dennis further stated that the appellant changed clothes while at his home.

On December 19, 1996, the appellant was interviewed for the second time by Hinesly, at the Butler County Sheriff's office, with Deputy Johnston present. The appellant was again *Mirandized*, and, while he refused to sign the written *Miranda* form, waiving his rights, he did agree to talk with Hinesly about the murders. When Hinesly told the appellant that his stories as to his whereabouts at the time of the murders did not check out, he became upset and told Hinesly that although he wanted to tell him the truth, he could not and had to let the evidence speak for itself. At that point, the appellant asked to speak to his brother. After being summoned, the brother spoke to the appellant for about five minutes, then left. At some point, the appellant began "acting sort of strange." He started rocking back and forth in his chair, and acted like he was no longer listening to Hinesly's questions. Hinesly handcuffed him, believing that he might be a danger to himself or others. The interview was not resumed until Hinesly believed that the appellant was capable of proceeding.

Once the interview resumed, the appellant confessed. His confession was neither videotaped nor audiotaped. In his confession, the appellant told Hinesly that he had gone to the victims' home to get money to leave town because he was afraid that he would be revoked on his parole. When he went there on the morning of the murders, there was a disagreement between Irene and Candy as to who was going to write the check for $1,000. Initially, Irene agreed to write the check, but after writing it out, she refused to sign it. Candy then agreed to write the check. He told Hinesly that he then drove them to the bank where the check was cashed, and he received the money. When they arrived back at the victims' home, he said he tied them up to give him time to leave town. However, as he was leaving, he saw that

Irene had already freed herself and was watching him out of the kitchen window. He returned to the house to re-tie her. While re-tying her, he claimed that Irene was reaching for a knife or gun, and that both victims would not stop screaming, so he "shut them up." He denied that he sexually assaulted Candy and claimed they would not find any semen at the scene. The appellant told Hinesly that he wore gloves while at the victims' home so as not to leave any fingerprints and that he had thrown the camouflage jacket he was wearing out the car window because it had blood on it. He admitted that when he returned to Poplar Bluff, he checked into the Tower Motel, because he feared that he might have been followed.

On the same day of the appellant's confession, a search warrant was obtained for the home of the appellant's brother, where the appellant lived. During the execution of that warrant, on the same day it was obtained, 32 ropes and cords were found in the appellant's bedroom. A microscopic comparison of the ropes and cords established that two of the ropes and four of the cords were consistent in color, composition and construction with the ropes that had been used to tie up the victims. Also found during the search, in a wastebasket in the appellant's bedroom, were some handwritten notes, one of which bore the name "Candace" and the telephone number of one of the telephone lines to the victims' home. One of the notes had directions from Poplar Bluff to the victims' home, while another had written on it: *"Things for First Entrance."* And, under that was written: "gun (back)—handcuffs (pocket)—12 ft of rope (legs) in two 6 ft pieces." Also found in the bedroom were a Crown Royal bag containing handcuffs; a duffel bag containing ropes, twine and other items; a videotape of the movie "Independence Day" without a box; cash—six

twenty-dollar bills and three one-dollar bills; a sales receipt dated December 17 reflecting a purchase with a $100 bill; and three telephones.

The white Ford Taurus being driven by the appellant was also seized and processed. Blood was found on the driver's door and door handle, the steering wheel, and the trunk clasp. The blood on the steering wheel was determined to be human blood. DNA analysis revealed that the blood on the door handle was consistent with being a mixture of Irene's blood and the blood of another.

Prior to opening statements in this case, the appellant filed "Defendant's Motion to Dismiss or in the Alternative to Preclude the State from Seeking the Death Penalty and to Exclude Testimony of Kristie Strickland Evans Regarding Identification of Defendant." The motion was taken up and heard on November 10, 2004, prior to the opening statements of counsel. In his motion, the appellant sought, *inter alia*, to have his case dismissed, claiming double jeopardy barred retrial due to prosecutorial misconduct. He alleged that the prosecutor in *Barriner I* and *II* had withheld exculpatory evidence concerning Evans's failure to identify the appellant in a police photo lineup. In his motion, the appellant also sought to prevent Evans from identifying him in court as the man she saw at the bank with Candy on the morning of the murders, withdrawing money from Candy's account. The motion was overruled. At trial, when the State sought to introduce the identification testimony of Evans, the appellant objected. The objection was overruled.

Prior to the jury hearing evidence, the appellant also sought to exclude his confession. In both *Barriner I* and *II*, the appellant filed a motion to suppress his confession as being involuntary, both of which were overruled. In this case, he filed a written motion to adopt his previously filed motions to suppress, in support of which he filed the transcripts of the prior suppression hearings. In his previous motions, he alleged that his confession was involuntary because it was coerced by threats of physical violence by Hinesly and because he was under the influence of methamphetamine The motion to adopt was sustained, and the motion to suppress was taken under advisement. At trial, when the State sought to introduce the appellant's confession through the testimony of Hinesly, the appellant objected on the basis that it was involuntary as alleged in his prior motions to suppress. The objection was overruled, the trial court stating that its ruling was as it was in the prior trials, in which the court specifically found that the appellant's confession was not involuntary as he had alleged.

The jury, having found the appellant guilty on both counts of murder, recommended that he be sentenced to life in prison on each count, with no chance of probation or parole. On December 17, 2004, after denying the appellant's motion for new trial, the trial court sentenced the appellant in accordance with the jury's recommendation.

This appeal follows.

## I.

Because our resolution of Point I depends on our resolution of both Points II and IV, we will discuss the appellant's Points Relied On in the following order: II, IV, I, and III.

In Point II, the appellant claims that the trial court erred in overruling his motion to suppress and allowing at trial, over his objection, State's witness, Evans, the bank teller at a bank in Risco, to identify him in court as the man she saw at the bank with Candy on the morning of

the murders, withdrawing money from Candy's account, because the "State did not show by clear and convincing evidence that there was a reliable independent basis for [her] identification," rendering it inadmissible as being "unreliable and impermissibly suggestive." Specifically, he claims that Evans's in-court identification of him was inadmissible, as being "unreliable," in that it was not based on her independent observation and recollection, but on impermissibly suggestive circumstances, namely, her having seen him during his two prior trials, sitting in court at counsel table with defense counsel and being referred to as the defendant.

 On the first day of trial, November 9, 2004, the appellant filed a motion in which he sought, *inter alia*, to suppress any testimony of Evans at trial identifying him as the man she saw with Candy at the bank where Evans was working on the morning of the murders. The motion was taken up and heard on November 10, 2004, prior to the opening statements of counsel, and was overruled. A motion to suppress preserves nothing for appeal in that the ruling on the motion is interlocutory. *State v. Wolf,* 91 S.W.3d 636, 642 (Mo.App. 2002). To properly preserve the issue of the admissibility of the evidence sought to be excluded by the motion, there must be an objection at the time the evidence is offered for admission at trial. *Id.* As stated in *Anglin v. State,* 157 S.W.3d 400, 402 (Mo.App.2005): "Sometimes an appellate court may, in reviewing a challenge to the admission of evidence, use language suggesting it is reviewing the denial of a motion to suppress. The traditional rule, however, is that the denial of a defendant's motion to suppress preserves nothing for appeal." In this case, the appellant did object to Evans's in-court identification of him at trial, so that the issue was properly preserved for appeal. Hence, our review

is of the trial court's ruling on the appellant's objection to the admission of Evans's identification testimony, not the denial of his motion to suppress.

 Assuming that the trial court has not erroneously declared or applied the law, its ruling on an objection to in-court identification testimony becomes a matter of discretion. *State v. Berry,* 168 S.W.3d 527, 532 (Mo.App.2005). Hence, we will not disturb a trial court's ruling on an objection to in-court identification evidence, unless we find an abuse of discretion based on the record. In conducting our review, we not only consider the record of the trial, but also the record made of the suppression hearing. *State v. Reed,* 157 S.W.3d 353, 356 (Mo.App.2005). An abuse of discretion is found when the decision to admit or exclude the challenged evidence is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). In our review, we defer to the trial court's superior opportunity to judge the credibility of the witnesses and view the facts in the light most favorable to the trial court's ruling, disregarding any facts and inferences contrary to the ruling. *State v. Chilton,* 119 S.W.3d 176, 178 (Mo.App. 2003).

 In determining whether to exclude an in-court identification of the defendant, the trial court employs a two-part test. *State v. Berry,* 168 S.W.3d at 532. First, the defendant must show that the pretrial identification procedures employed were impermissibly suggestive. *Id.* And, if the court finds that they were, then the defendant must show that they were so suggestive that there was a substantial likelihood that the reliability of the identification evidence was called into question. *Id.* While reliability is the linchpin in determining the identification testimony's ad-

missibility, the defendant "must clear the suggestiveness hurdle before procuring a reliability review." *State v. Vinson*, 800 S.W.2d 444, 446 (Mo. *banc* 1990) (citations omitted). If the defendant carries his burden, in showing that both prongs of the test are satisfied, then both the out-of-court and in-court identifications by the witness of the defendant must be excluded by the trial court. *State v. Hunter*, 43 S.W.3d 336, 340 (Mo.App.2001).

■ As to suggestiveness, " '[a] pretrial identification procedure is unduly suggestive if the identification results not from the witness's recall of first-hand observations, but rather from the *procedures or actions employed by the police.*' " *Id.* (citation omitted) (emphasis added). Here, the appellant makes no argument on appeal that Evans's in-court identification of him resulted from any allegedly impermissibly suggestive pretrial identification procedures *employed by the police* in their dealings with Evans. Rather, as to the first prong of the two-part test for admissibility, that the pretrial identification procedures employed were impermissibly suggestive, he simply argues that Evans's testimony was tainted and unreliable in that, rather than being based upon her own independent recollection and observation of the appellant on the day of the murders, her identification resulted from the fact that: "This was the third trial that Evans had seen Barriner as a defendant." In other words, he is contending on appeal that Evans's in-court identification of him was not the result of suggestive pretrial identification procedures employed by the police, but the result of her seeing him at counsel table seated next to defense counsel during the appellant's trials.

As legal authority for his claim in this point, the appellant cites three cases: *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct.

458, 54 L.Ed.2d 424 (1977); *United States v. Rundell*, 858 F.2d 425 (8th Cir.1988); and *United States v. Archibald*, 734 F.2d 938 (2nd Cir.1984), for the proposition that an eyewitness's knowledge that the person seated at counsel table is the defendant is unduly suggestive rendering an in-court identification inadmissible. However, *Moore* is distinguishable and the other two cases are from foreign jurisdictions, by which we are not bound, *see Angelos v. State Bd. of Registration for the Healing Arts*, 90 S.W.3d 189, 192 (Mo.App.2002), and are contrary to well-established law of this state found in *State v. Winters*, 900 S.W.2d 636, 641 (Mo.App.1995), which we see no rationale for overruling as binding precedent. As the appellant points out, the Court in Moore did, in fact, opine: "It is difficult to imagine a more suggestive manner in which to present a suspect to a witness for their critical first confrontation than was employed in this case." 434 U.S. at 229, 98 S.Ct. 458. However, in so opining, the Court was not addressing the issue presented in this point, the admissibility of identification testimony, but whether the petitioner had a right to counsel at that "critical first confrontation." *Id.* Hence, despite the "suggestive" language, *Moore* is not persuasive as to the issue raised in this point.

In *State v. Winters*, the court rejected the near-identical argument that the appellant makes in this case, that the defendant's being seated at the counsel table at the time he was identified constituted impermissible suggestiveness, tainting its reliability and rendering it inadmissible, because it did not attack pretrial identification procedures of the police. 900 S.W.2d at 640–41. In rejecting the defendant's argument and upholding the trial court's refusal to suppress the in-court identification evidence, the *State v. Winters* court stated:

Where … the defendant's arguments do not involve a claim of impermissible suggestiveness on the part of the police, but rest entirely on factors relating solely to the reliability of the identification made by a particular witness or witnesses, he has no valid basis for arguing that the witness' identification testimony should have been suppressed, because any such factors go only to the *weight* of the testimony, not its *admissibility*.

*Id.* at 640–41. Hence, in accordance with *State v. Winters,* in failing, on appeal, to make any argument with respect to police pretrial identification procedures influencing Evans's in-court identification in any way, the appellant cannot succeed on his claim that the trial court erred in failing to suppress Evans's in-court identification of him.

Point denied.

## II.

In Point IV, the appellant claims that the trial court erred in overruling his motion to suppress and admitting at trial, over his objection, his oral confession, because under the totality of the circumstances, it was involuntary due to its being coerced and being made while he was under the influence of methamphetamine. Specifically, he claims that his confession was involuntary because it was coerced by his interrogator, Hinesly, in that he refused to sign a written waiver of rights after being *Mirandized* prior to confessing during his second interrogation and because Hinesly:

threatened [him] during interrogation by displaying his weapon and by telling [him] that Irene had a nephew—a retired trooper now working as a sheriff— who would see to it that [he] was

harmed in jail and Hinesly would not ensure [his] safety if he did not confess to the killings.

He also claims that his confession was involuntary because it was made under the influence of methamphetamine in that he suffered from an "incoherent condition during interrogation to the extent that Hinesly put handcuffs on [him] because he believed that [he] was a danger to himself and the officers after [his] eyes rolled up into his head and he started rocking back and forth in his chair as if he could not hear the officers[.]"

▓▓▓ Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a criminal defendant, who is taken into custody by the police, must be advised of certain constitutional rights, including his Fifth Amendment right to remain silent. Accordingly, a defendant cannot be requested to give a statement, while in custody, unless he first is advised of and understands his rights, and he voluntarily, knowingly, and intelligently waives those rights. *State v. Greer,* 159 S.W.3d 451, 457 (Mo.App.2005). When a criminal defendant challenges the admission of his confession at trial on the ground that it was involuntary, as here, the confession will not be allowed unless the State can show, by a preponderance of the evidence, that it was, in fact, voluntary. *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998); *State v. Smith,* 944 S.W.2d 901, 910 (Mo. banc 1997); *State v. Skillicorn,* 944 S.W.2d 877, 891 (Mo. banc 1997). In that regard, Rule 24.05 [3] provides that: "Requests that evidence be suppressed shall be raised by motion before trial; however, the court may in its discretion

**3.** All rule references are to Missouri Rules of Criminal Procedure, 2006, unless otherwise

indicated.

entertain a motion to suppress evidence at any time during trial."

In both *Barriner I* and *II*, the appellant filed a pretrial motion to suppress his confession as being involuntary, both of which were overruled. In this case, he filed a motion to adopt his previously filed motions to suppress, in support of which he filed the transcripts of the prior suppression hearings. The motion to adopt was sustained and the motion to suppress was taken under advisement. At trial, when the State sought to introduce the appellant's confession through the testimony of Hinesly, the appellant objected on the basis that it was involuntary as alleged in his prior motions to suppress, preserving the issue for appeal. The objection was overruled, the trial court stating that its ruling was as it was in the prior trials, in which the court specifically found that the appellant's confession was not involuntary as alleged.

■ In our review of the trial court's ruling, allowing the appellant's confession over the appellant's objection that it was involuntary, we consider not only the trial record, but also the record of the prior suppression hearings. *State v. Reed*, 157 S.W.3d at 356. Our review is limited to determining whether the trial court's ruling is supported by substantial evidence. *State v. Rousan*, 961 S.W.2d at 845; *State v. Owsley*, 959 S.W.2d 789, 794 (Mo. *banc* 1997); *State v. Smith*, 944 S.W.2d at 910. We will not overturn the trial court's ruling "absent manifest error." *State v. Williams*, 956 S.W.2d 942, 948 (Mo.App.1997). In our review, we are to pay deference to the trial court's factual and credibility determinations in making its ruling, viewing the facts in a light most favorable to the ruling. *State v. Rousan*, 961 S.W.2d at 845. Hence, the fact that there is support in the record for a contrary ruling is immaterial. *State v. Ows-*

*ley*, 959 S.W.2d at 794. And, while the trial court is not required to make written findings of fact and conclusions of law as to its ruling, it must make a clear-cut determination that the confession was, in fact, voluntary, which must appear from the record with unmistakable clarity, *State v. Knese*, 985 S.W.2d 759, 767 (Mo. *banc* 1999).

■ As stated in *State v. Vinson*, 854 S.W.2d 615, 620 (Mo.App.1993):

The admissibility of inculpatory statements depends upon whether they were compelled within the meaning of the Fifth Amendment to the United States Constitution.

A confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .

(Citations omitted) (*quoting Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). A defendant is denied due process if his conviction is founded, in whole or in part, upon an involuntary confession. *State v. Owsley*, 959 S.W.2d at 794; *State v. Mitchell*, 2 S.W.3d 123, 126 (Mo.App.1999). Hence, such a conviction would require reversal unless the error in admitting it was harmless. *State v. Seibert*, 93 S.W.3d 700, 707 (Mo. *banc* 2002).

■ The test for determining the voluntariness of a confession, to allow its admission over the defendant's objection, is well settled.

The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree

that the defendant's will was overborne at the time he confessed.

*State v. Rousan,* 961 S.W.2d at 845.

In addition to the question of whether the defendant was advised of his rights and understood them, factors to be considered in reviewing the totality of the circumstances include the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs.

*Id.* "When considering the totality of the circumstances, no single fact is dispositive. The fact that the defendant voluntarily waived *Miranda* rights is not dispositive of the voluntariness issue, but is an important consideration." *State v. Blackman,* 875 S.W.2d 122, 135 (Mo.App.1994) (*citing State v. Lytle,* 715 S.W.2d 910, 915 (Mo. banc 1986)).

In determining whether a confession was obtained by mental coercion, age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion are relevant factors. Although courts take into consideration education and intelligence in determining voluntariness, these factors are not determinative; the totality of the circumstance must be considered.

*State v. Clark Jr.,* 859 S.W.2d 782, 788 (Mo.App.1993) (internal citations omitted).

Here, the appellant makes no challenge to his confession based on his not being given his *Miranda* warnings. Rather, he is claiming that the trial court erred in not excluding his confession as being involuntary because: (1) it was drug-induced; and/or (2) it was coerced by the police through a threat of physical violence.

■■■■ As to the appellant's claim that his confession was involuntary as being drug-induced, it is well settled in the law that "the inquiry on voluntariness of a statement extends only to determining if a statement was elicited by coercive police tactics." *State v. Blackman,* 875 S.W.2d at 134 (*quoting Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). "Voluntariness depends on the absence of police overreaching, not on the mental ability of the defendant to make a 'choice.'" *State v. Skillicorn,* 944 S.W.2d at 889 (citations omitted). "A statement which is induced by psychosis or a mental disease which destroys a defendant's volition and makes him confess is not involuntary within the meaning of the due process clause." *State v. Blackman,* 875 S.W.2d at 134. Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary. *State v. Skillicorn,* 944 S.W.2d at 890; *see also State v. Mitchell,* 2 S.W.3d at 127. "'[M]ental ability to make a choice' is not the measure of voluntariness." *State v. Skillicorn,* 944 S.W.2d at 890 (*quoting Colorado v. Connelly,* 479 U.S. at 169–70, 107 S.Ct. 515). "Mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional 'voluntariness.'" *Id.* (*quoting Connelly,* 479 U.S. at 164, 107 S.Ct. 515). Intoxication is not determinative of whether a confession was involuntary, but goes to the weight and credibility to be accorded the statement. *State v. Mitchell,* 2 S.W.3d at 128. Hence, while the appellant's alleged drug-induced state, affecting his mental condition, might be a relevant factor in determining whether his confession was, in fact, coerced by the police, absent actual police coercion, it is not a sufficient basis for finding that his confession was involuntary, requiring exclusion, as the appellant claims.

As to the appellant's alleged drug-induced state being a factor in whether his

confession was coerced, at the suppression hearing from the appellant's first trial, Hinesly testified: "I believe in my twenty-two years [in law enforcement] I've seen, I can make a reasonable deduction whether somebody is under the influence of alcohol or drugs." His response to the question of whether: "On the 18th when you saw Mr. Barriner, did he appear to be under the influence of drugs?" was: "Not in my opinion, no sir." At the suppression hearing conducted in *Barriner II*, Hinesly testified that at one point, the appellant "started acting sort of weird. He was acting like he wasn't listening to us.... He would roll his head back, flutter his eyes.... I said, 'Can you hear me? Are you staying with me?'" In this trial, Hinesly testified that at some point in the interrogation, the appellant "started acting sort of strange. He almost started rocking back and forth in his chair. And it was almost like he wasn't listening to us. I kept saying 'Cecil. Cecil, Cecil stay with me.' And we got a little concerned." According to Hinesly's testimony at the suppression hearing in *Barriner II*, the interrogation stopped at that point, and to ensure the safety of the appellant and the officers, the appellant was handcuffed. The interrogation did not continue at that time. He was only questioned about whether he "was okay and could hear." Hinesly further testified that he was not concerned for the appellant's medical well being, and after a few minutes had passed, and after the appellant "seemed to be fine," the questioning resumed. At the suppression hearing in *Barriner I*, Hinesly was asked: "Can you describe his demeanor and how he spoke and acted during these interviews?" His response was: "Fine."

As to the issue presented, the Missouri Supreme Court's holding in *State v. Knese* is instructive. There, the Court was faced with the issue of whether an allegedly deficient mental condition rendered the de-

fendant's confession involuntary. 985 S.W.2d at 766. It held that the fact that the defendant "may have used cocaine earlier in the day" and "was 'fading in and out of reality' some time before waiving his rights [was] not sufficient to render his waiver unintelligent." *Id.* The Court based its holding on the fact that: "A defendant does not have the constitutional right to confess to his crime only when totally rational and properly motivated"; and the defendant in that case "repeatedly waived his *Miranda* rights over a period of many hours and gave detailed, coherent statements over that time." *Id.* (quotation marks and citation omitted) (emphasis added).

The general tenor of our case is very similar to *State v. Knese*. Here, the record in a light most favorable to the trial court's ruling would only support a conclusion that at best, from the appellant's perspective, he had one brief episode of incapacitation on some level that may have been induced by methamphetamine, which would have had to have been ingested at least one day earlier, as he was arrested on December 18, 1996, and he gave his confession on December 19, 1996. Hinesly's testimony, however, would support the fact that the appellant's claimed drug-induced state in no way rendered his confession involuntary. Thus, the only question in determining the voluntariness of the appellant's confession is whether it was coerced by a threat of physical harm, as he also claims in this point.

 In claiming that his confession was involuntary because it was coerced by physical threats by Hinesly, the appellant first points to the fact that after being re-*Mirandized*, prior to his second interrogation, during which he confessed, he refused to sign a written waiver of rights. In that regard, the day before, the day of his

arrest, after being *Mirandized,* he waived his rights in writing and agreed to talk. Although Hinesly re-*Mirandized* the appellant the next day, prior to the second interrogation, he was not required to do so. *State v. Carollo,* 172 S.W.3d 872, 875 (Mo.App.2005). This is so in that *"Miranda* warnings are not so ephemeral that they evaporate between questionings." *State v. Clemons,* 946 S.W.2d 206, 220 (Mo. banc 1997) (emphasis added). Absent circumstances dictating otherwise, *Miranda* warnings need not be given each time an accused is questioned simply because a period of time has passed between the interrogation and the warnings being read. *State v. Carollo,* 172 S.W.3d at 875. Moreover, *Miranda* did not require that the appellant execute a written waiver of rights after being re-*Mirandized* prior to his second interrogation. *State v. Groves,* 646 S.W.2d 82, 85 (Mo. banc 1983). An oral waiver would have been sufficient. *Id.* Thus, to the extent that the appellant is claiming that his refusal to sign a written waiver, after being re-*Mirandized* prior to the second interrogation, during which he confessed, was, in and of itself, fatal to the voluntariness of his confession, he is mistaken.

It may be that the appellant is not claiming that his refusal to sign the waiver of rights form, in and of itself, tainted his confession. Rather, he may be contending simply that it can be reasonably inferred from that fact that he had no intention, at the time, of confessing of his own free will, but was subsequently coerced into confessing by the alleged threat made by Hinesly. In other words, he may be contending that his refusal to sign the waiver of rights form is consistent with his contention that he refused initially to talk to Hinesly and that he only changed his mind after being threatened by him. While this may or may not be a reasonable inference from the evidence supporting the appellant's po-

sition, that his confession was involuntary, under our standard of review, we are to ignore any inferences that are contrary to the trial court's ruling. *State v. Owsley,* 959 S.W.2d at 794. Hence, the fact that it might be a reasonable inference does not win the day for the appellant with respect to his claim that his confession was inadmissible as being involuntary.

 The appellant also claims that his confession was coerced by Hinesly because he:

> threatened [him] during interrogation by displaying his weapon and by telling [him] that Irene had a nephew—a retired trooper now working as a sheriff—who would see to it that [he] was harmed in jail and Hinesly would not ensure [his] safety if he did not confess to the killings.

A threat of physical harm to the defendant by the police, if he does not confess, can render a subsequent confession involuntary if the threat is credible and is of such a character that it would reasonably overcome the defendant's "free choice" as to whether to invoke his Fifth Amendment right to remain silent or confess. *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *State v. Lytle,* 715 S.W.2d 910, 915 (Mo. banc 1986). Hinesly, however, denied that he ever threatened the appellant with any physical harm if he did not confess. Rather, at the suppression hearing in *Barriner II,* the record reflects that he testified, under questioning by the State concerning the alleged threat he made to the appellant, involving Irene's nephew, Steve Bartlett, a former Missouri Highway patrolman and Sheriff of Ozark County: "I told [the appellant] what I thought [Sheriff Bartlett] would feel about [the death of Irene.] I told him he'd like to see him in prison." Hence, although the appellant contends on

appeal that Hinesly threatened him that if he did not confess, Sheriff Bartlett would see to it that he was harmed in jail, and Hinesly would not ensure his safety, Hinesly testified otherwise, which, in a light most favorable to the trial court's ruling, would support the court's determination that the appellant's confession was not coerced by a physical threat concerning Sheriff Bartlett.

■ As to Hinesly's statement to the appellant concerning Sheriff Bartlett, we fail to see how it would in any way constitute a credible threat of physical harm to the appellant if he did not confess. In fact, the statement, as testified to by Hinesly, is not coercive in any way in that it does not suggest that the appellant's failure to confess would result in physical harm to him from Sheriff Bartlett. In fact, it would appear that the appellant's confession would only further fuel Sheriff Bartlett's desire to see the appellant in prison for murdering the sheriff's aunt such that the appellant's confessing would in no way be a benefit to him. In other words, we fail to see how the appellant's confessing, in light of Hinesly's testimony as to what he told the appellant, would have benefited the appellant, in avoiding physical harm by Sheriff Bartlett, to such a degree that his "free choice" would have been overcome, inducing him to confess to a crime that he did not commit. *See State v. Dennis,* 153 S.W.3d 910 (Mo.App.2005) (holding that a promise of leniency does not affect the voluntariness of a confession unless it *promises a benefit, a positive,* to the defendant if he confesses such that his free choice to remain silent or speak is overcome by the desire to receive the promised benefit. This same rationale would logically apply to threats of physical harm if the defendant does not confess, except in that case, his free choice would be overcome by his desire to avoid a negative, physical harm, by confessing). Rath-

er, it appears that Hinesly's comment to the appellant about Sheriff Bartlett's desire to see him in prison for murdering his aunt simply conveyed what would appear to be the obvious, that because Sheriff Bartlett believed that the appellant had killed his aunt, he wanted him in prison. There is nothing about Hinesly's comment, in accordance with his testimony, that would suggest that the appellant had anything to gain, either receiving a promised benefit or avoiding a threatened negative consequence, by confessing against his will.

Based on the totality of the circumstances and viewed in a light most favorable to the trial court's overruling of the appellant's objection to the admission of his confession as being involuntary, we find that the record supports the court's determination that the appellant's confession was not rendered involuntary due to his being threatened with physical violence, or by the fact that he did not sign a written waiver of rights prior to his second interrogation, or because he was incoherent due to a drug-induced state.

Point denied.

### III.

■ In Point I, the appellant claims that the trial court erred in allowing, over his objection, the testimony of the State's witness, Dubois, regarding the telephone conversation she had on the morning of the murders with her niece, Candy, because it was hearsay offered to prove the truth of the matters asserted, that unexpectedly, on the morning of the murders, a man appeared at the home of the victims, who was acting strangely and told Irene that he had a gift for Candy from her mother, who was in prison, causing Candy to be afraid, and no hearsay exception applied for its admission. Specifically, he

claims that Dubois's challenged testimony was inadmissible hearsay in that it was not introduced for the purpose of explaining her subsequent conduct and to establish a timeline, as the State contended at trial, but rather to show the truth of the matters asserted, from which the jury could have reasonably inferred that the man in question was not only the murderer, but was the appellant, in that the appellant knew Candy's mother, Shirley.

"Trial courts typically have broad discretion in deciding whether to admit evidence." *State v. Williams*, 976 S.W.2d 1, 2 (Mo.App.1998). "The trial court's decision will not be disturbed unless a clear abuse of discretion is shown." *Id.* (citation omitted). Abuse of discretion is found when the decision "is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id.* (citation omitted).

■■■ Even assuming, *arguendo*, that the trial court erred in admitting Dubois's testimony because it was inadmissible hearsay, the appellant still cannot succeed on this point in that he did not show resulting prejudice. *State v. Thompson*, 112 S.W.3d 57, 63 (Mo.App.2003). For error to be prejudicial, requiring reversal, the appellant must show there is a reasonable probability that had the evidence not been admitted, the outcome at trial would have been different. *Id.* As stated by the Missouri Supreme Court in *Barriner I,* in determining prejudice from the admission of inadmissible evidence:

> The question is not ... whether the state made a submissible case, but whether the prejudice resulting from improper admission of evidence is outcome-determinative, requiring reversal. Put another way, the question is whether the evidence had an effect on the jury's deliberations to the point that it contributed to the result reached. Even if reasonable minds may differ with respect to whether there is overwhelming evidence of guilt in this case, that is not the only consideration.

34 S.W.3d at 151. Hence, the appellant cannot show prejudice, requiring reversal based on the claim of error in this point, unless he can show that Dubois's testimony "had an effect on the jury's deliberation to the point that it contributed to the result reached."

The State's theory of the case at trial was that the appellant robbed the victims and then killed them. It was argued that he sought out the victims to obtain money from them so he could leave town, fearing that he would be revoked on an existing parole he was serving. He believed that the victims might have money based on his prior relationship with Candy's mother and Irene's daughter, Shirley. On the day of the murders, the appellant went to the victims' home and demanded money from them and forced them to accompany him to Candy's bank in Risco so she could withdraw $1,000 from her account, where they were seen by Dubois. Upon returning to the victims' home, the appellant confessed that he tied them up and intended to leave them alive; however, as he was leaving the house, he saw that Irene had already freed herself, so he went back inside the house to re-tie her, and he killed them. Because it was otherwise established that the appellant knew Candy's mother and was looking for money to get out of town in a hurry, it is reasonable to assume that the State was introducing the evidence concerning Candy's telephone conversation with Dubois to show that a man familiar with Candy's mother had been at the victims' home the morning of the murders, who was acting strangely and frightened her, who was the likely killer,

given the other evidence in the case and the State's theory of the case, so that the jury could reasonably infer that it was the appellant, since he knew Candy's mother.

Given the State's case at trial, we fail to see how Dubois's testimony had an effect on the jury's deliberations to the point that it contributed to his being found guilty such that the outcome would have been different had it been excluded. *Id.* Not only did the jury in this case have the appellant's confession on which to rely to convict, it also had Evans's in-court identification of him as the man who accompanied Candy to the bank to obtain the money from her account. Obviously, given the appellant's established perceived need for quick cash, the man's actions at the bank, and the timeline, it is a very strong inference that the man who accompanied Candy to the bank was the murderer. At the bank, the evidence was that Candy's withdrawal was in $100 bills, except for $100 in $20 bills. The appellant was identified as having made purchases soon after the murders, using $100 bills, and several $20 bills were found in his wallet. Further strengthening the inference that the man at the bank was the murderer is the fact that Evans testified that the vehicle in which Candy arrived at the bank was a white Ford Taurus or Mercury Sable, driven by her male companion. There was evidence that during that time, the appellant was driving his parents' white Ford Taurus, on which the police found blood on the driver's door handle and which DNA testing determined was human blood, a mixture of two individuals, one of whom was Irene. There was also evidence that a medium-size white vehicle was seen cruising the crime scene several hours before the victims' bodies were found. Further connecting the man at the bank to the crime scene is the fact that the police found at the scene an unsigned check for $1,000 written by Irene, the same amount of the check written and signed by Candy. And, the fact that the check is unsigned is consistent with the appellant's confession that Irene first agreed to give him the money demanded and then changed her mind, leaving Candy to do so.

In addition to the appellant's confession and Evans's in-court identification of the appellant and related evidence, there was other substantial circumstantial evidence linking the appellant to the crimes. In a search of the appellant's room at his brother's home, where he was staying, notes were found, which included the name of one of the victims, one of the victims' residence's telephone numbers, directions to the victims' home, and a list of what appeared to be items needed for commission of the crime. The list included items such as a gun, handcuffs, and rope. The rope found in the appellant's bedroom was tested and found to match the ropes with which the victims had been bound. Items similar to those found missing from the victims' home, including a telephone, a VCR, and videotape of the movie "Independence Day," were either found by the police in the appellant's bedroom or were linked to the appellant through testimony at trial.

Further evidence linking the appellant to the crimes can be found in the fact that Kevin Dennis, a friend of the appellant's, testified that the appellant gave him a VCR on the evening of the murders. A VCR was missing from the victims' home. In addition, he testified that contrary to the appellant's confession, the appellant was not visiting him at the time of the murders, but was there after the murders, in the evening, when he changed clothes.

In light of the record and the State's theory of the case, we fail to see how Dubois's testimony concerning her telephone conversation with Candy added

much to the equation of the jury's finding the appellant guilty. Other than an inference, placing the appellant at the home of the victims on the morning of the murders, it adds little or nothing else. Its significance is slight given the other evidence in the case. Hence, we conclude that its contribution, if any, to the appellant's being found guilty, was not such that the outcome of his case would have been different had Dubois's testimony concerning the telephone conversation with Candy been excluded as hearsay, demonstrating prejudice and requiring reversal.

In ruling as we do in this point, we are mindful of what the Supreme Court had to say in *Barriner II* concerning whether the appellant's confession constituted overwhelming evidence of the appellant's guilt such that the found trial court error, in excluding exculpatory hair evidence found at the crime scene, was harmless error. 111 S.W.3d at 401. In finding that the exclusion of that evidence was prejudicial, requiring reversal, the Court noted that the "exclusion of admissible evidence creates a presumption of prejudice," which is rebutted "[i]f the proof of [the appellant's] guilt was overwhelming." *Id.* In resolving the issue on appeal of whether the evidence of the appellant's guilt was overwhelming or not, primarily relying on the appellant's confession, the Court opined:

> Often, a confession will provide the state with an overwhelming case. However, [the appellant's] confession was not videotaped or audiotaped, and [the appellant] did not put his statement in writing. The jury received evidence of [his] confession only through an officer's testimony, requiring the jury to rely upon the officer's credibility and accurate memory. The remainder of the evidence was circumstantial. There was no eyewitness of [his] committing the murders. There was no physical evidence implicating [him] found at the

crime scene (such as fingerprints, footprints, blood, semen or hair). The evidence of [his] guilt is not overwhelming, and it is insufficient to overcome the presumption of prejudice.

*Id.* Here, unlike in *Barriner II*, the State introduced the in-court identification testimony of Evans, identifying the appellant as the man at the bank with Candy, withdrawing the money from her account. This new evidence, along with all the other evidence in the record, other than the confession, is clearly sufficient to tip the scales such that in keeping with the binding correct standard of prejudice, set forth meticulously by the Court in *Barriner I*, it is obvious to us that any contribution of the challenged evidence in this point to the jury's verdict of guilty was indeed slight such that its exclusion would not have changed the outcome of the appellant's case.

Point denied.

## IV.

In Point III, the appellant claims that the trial court erred in overruling his motion to dismiss and allowing his case to proceed to a third trial, his prior convictions for murder having been reversed and his case remanded to the trial court by the Missouri Supreme Court in *Barriner I* and *II*, because his Fifth Amendment right to be free from double jeopardy was violated by the prosecutor's misconduct in his prior trials in failing, as required, to disclose exculpatory evidence concerning the failure of the bank teller, Evans, to identify the appellant from an out-of-court police photo lineup. Specifically, he claims that his double jeopardy rights were violated by his having to stand trial for a third time in that the prosecutor failed in his duty to disclose to the defense, in the appellant's two prior trials, that Evans had picked

someone other than the appellant out of a police photo lineup, Exhibit C, as the man most resembling the man with Candy at the bank.

 Double jeopardy protection is found in both the United States and Missouri constitutions. *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 50 (Mo. *banc* 2006). However, protection under the Missouri constitution applies only to retrial after acquittal, *id.*, which does not help the appellant in our case. Hence, as to his claim in this point, he must rely on the Fifth Amendment Double Jeopardy Clause, which provides that "no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb,'" made applicable to the states through the Fourteenth Amendment. *U.S. Const. amend. V*; *State ex rel. Kemper v. Vincent*, 191 S.W.3d at 50. There are "[t]hree distinct abuses ... prevented by the Double Jeopardy Clause [of the Fifth Amendment]: (1) a subsequent prosecution for the same offense after acquittal; (2) a subsequent prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *State v. Angle*, 146 S.W.3d 4, 10 (Mo.App.2004).

 Once the jury is impaneled and sworn, double jeopardy attaches. *State ex rel. Kemper v. Vincent*, 191 S.W.3d at 51. Here, however, in both *Barriner I* and *II*, the Supreme Court reversed on the basis of the improper admission of evidence and remanded for a new trial, *State v. Barriner*, 34 S.W.3d at 139; *State v. Barriner*, 111 S.W.3d at 396, implicitly finding that double jeopardy did not work to prevent the retrial of the defendant in a second or third trial. And, in fact, the law is well settled that double jeopardy does not protect a defendant from retrial where his conviction is overturned "solely due to trial error." *State v. Hayes*, 23 S.W.3d 783, 792 (Mo.App.2000). In this appeal, however,

the appellant is claiming that Fifth Amendment double jeopardy prevented his third trial due to prosecutorial misconduct for the prosecutor's breach of his duty to disclose exculpatory evidence to the defense, specifically, the photo-lineup evidence in question, which was not raised in either *Barriner I* or *II*.

 In this point, the appellant is claiming that the prosecution had a duty in both *Barriner I* and *II* to disclose the alleged exculpatory photo-lineup evidence in question. However, he fails to make any argument in his brief as to the genesis of that duty, implicating double jeopardy protection, as he claims. He makes no argument that the State had a duty, as a matter of discovery, to disclose this evidence, or that it had a duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or any other basis for why the State had a duty to disclose the evidence. Rather, he merely concludes in his brief that the prosecutor was guilty of misconduct for breaching a duty to disclose to the defense, in *Barriner I* and *II*, the photo-lineup evidence in question. In any event, the State, in its brief, admits that its failure to disclose the evidence in question was a discovery violation. Likewise, it is clear that under *Brady*, the State was under an obligation to disclose to the defendant any exculpatory evidence it had. 373 U.S. at 87, 83 S.Ct. 1194. Nonetheless, the question still remains as to whether that failure amounts to prosecutorial misconduct that would invoke double jeopardy protection, barring the appellant's retrial. The question of whether double jeopardy applies to bar retrial is a question of law, which we review *de novo*. *State v. Angle*, 146 S.W.3d at 10.

In support of his claim in this point, the appellant cites, *inter alia, State v. Clover*, 924 S.W.2d 853, 857 (Mo. *banc* 1996), and *Oregon v. Kennedy*, 456 U.S. 667, 675–76,

102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In *State v. Clover,* the Missouri Supreme Court was faced with the issue of whether the trial court erred in declaring a mistrial *with prejudice,* barring the State from retrying the defendant, pursuant to the Double Jeopardy Clause of the Fifth Amendment. 924 S.W.2d at 855. The trial court declared that the mistrial was with prejudice because the State had deliberately asked an improper question regarding an uncharged offense to "bolster an extremely weak case," mandating a mistrial. *Id.* Although the Court affirmed the trial court's grant of a mistrial, it held that it was error to grant it *with prejudice* barring retrial under the Double Jeopardy Clause of the Fifth Amendment and remanded the case to the trial court for further proceedings. *Id.* at 857.

■ In ruling as it did in *State v. Clover,* the Court, relying in large part on *Oregon v. Kennedy,* clearly stated the law regarding when the Double Jeopardy Clause of the Fifth Amendment bars retrial where the trial court grants a mistrial:

> The Double Jeopardy Clause of the United States Constitution bars retrial if the trial court grants a mistrial without the defendant's request or consent. Generally speaking, however, the clause does not bar retrial when the defendant requests, or consents to, the mistrial. Where such a mistrial occurs, the defendant's right to a particular tribunal is *not* implicated unless governmental or judicial conduct was intended to 'goad' the defendant into requesting or consenting to a mistrial.

*Id.* at 856–57 (internal citations omitted); *see also State ex rel. Kemper v. Vincent,* 191 S.W.3d at 51. The rationale for not invoking the protections of the Double Jeopardy Clause, where the defendant requests or consents to a mistrial, unless "governmental or judicial conduct was in-

tended to goad" him into doing so, can be found in the fact that:

> Once a trial has begun, the defendant has a right to have his trial completed by the jury that has been selected. Besides the right to have a particular jury hear the case, the right to be free from double jeopardy also protects the defendant from expense, stigma, emotional distress, and the increased risk that an innocent defendant will be found guilty.

*State ex rel. Kemper,* 191 S.W.3d at 51 (citations omitted). The exception to the general rule that the Double Jeopardy Clause will not bar retrial after a mistrial is declared at the request or consent of the defendant is not triggered simply by prosecutorial misconduct. *State v. Clover,* 924 S.W.2d at 857. There must be an "intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* The dispositive issue, in determining whether the exception applies, is:

> whether defendant's motion for mistrial was motivated by prosecutorial conduct that was intended to provoke the defendant to request the mistrial. The effect of the question, as distinguished from the intent of its asking, is irrelevant in this inquiry. Instead, the court must make a finding of fact, "[i]nferring the existence or nonexistence of intent from objective facts and circumstances" that surround the proceedings.

*Id.* (*quoting Oregon v. Kennedy,* 456 U.S. at 675, 102 S.Ct. 2083).

In his brief, the appellant candidly admits that his case does not involve a mistrial, the context in which double jeopardy protection involving prosecutorial misconduct was discussed in *State v. Clover* and *Oregon v. Kennedy.* However, he contends that: "Double jeopardy rights can be implicated even if prosecutorial misconduct is not discovered until after trial,"

citing two cases from other jurisdictions: *State v. Minnitt,* 203 Ariz. 431, 55 P.3d 774, 782–83 (Ariz.2002), and *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321, 325 (1992). Both cases stand for the proposition that double jeopardy attaches to bar retrial not only in cases where the prosecutor engages in intentional conduct to goad or provoke the defendant into moving for a mistrial, but in cases where he engages in intentional conduct designed to prejudice the defendant and deny him a fair trial, which conduct is not discovered until after conviction, resulting in a motion to dismiss based on double jeopardy. *Id.*

The prosecutorial misconduct alleged in *State v. Minnitt,* 55 P.3d at 780, was that the prosecutor knowingly elicited false testimony at trial, and in *Commonwealth v. Smith,* 615 A.2d at 321, the alleged misconduct was, as was alleged in this case, the intentional failure to disclose exculpatory evidence. It is not clear in reading those cases whether their holdings were based on interpretations of the respective double jeopardy clauses of the individual states and/or the Double Jeopardy Clause of the Fifth Amendment. Both cite extensively to federal decisions interpreting the Fifth Amendment. However, in *Commonwealth v. Smith,* the court makes it clear that in ruling as it was, it was relying on the Double Jeopardy Clause of the Pennsylvania Constitution. 615 A.2d at 325. In any event, the court in *State v. Minnitt* did an excellent job of discussing why the double jeopardy protection afforded a defendant for prosecutorial misconduct in cases of mistrial should be extended to cases where the misconduct is discovered after trial. The court reasoned that: "Concealment of a prosecutor's serious misdeeds throughout the trial should not expose the defendant to multiple trials. This is exactly what the double jeopardy provision was intended to prevent." *State v. Minnitt,* 55

P.3d at 782 (quotation marks and citation omitted).

In holding as it did, the court in *State v. Minnitt* made it crystal-clear that not just any misdeed of the prosecutor would trigger double jeopardy protection. *Id.* at 781. Rather, adopting the same standard used in cases of state-intentionally-induced mistrials, the court's holding was targeting:

> improper conduct that is not merely the result of legal error or negligence, but constitutes intentional conduct that the prosecutor "knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal and the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial."

*Id.* (citations omitted). In doing so, the court:

> drew an important distinction between simple prosecutorial error, such as an isolated misstatement or loss of temper, and misconduct that is so egregious that it raises concerns over the integrity and fundamental fairness of the trial itself. Prosecutorial misconduct that permeates the process and intentionally destroys the ability of the tribunal to reach a fair verdict must necessarily be remedied.

*Id.* (citations omitted).

The parties do not cite, and our research does not disclose, any Missouri cases that have held that Fifth Amendment double jeopardy will attach to bar retrial for prosecutorial misconduct discovered after trial. Thus, this appears to be a case of first impression in Missouri. However, even if, *arguendo,* we were to agree with the reasoning of the Arizona and Pennsylvania courts and extend Fifth Amendment double jeopardy protection for prosecutorial misconduct to cases not involving a mistrial, such as here, the appellant's claim

■

would still fail in that he points to nothing in the record to suggest that the failure of the prosecutor to disclose the photo-lineup evidence in question was done intentionally to prevent the appellant from receiving a fair trial.

■ The appellant contends that the State intentionally failed, in *Barriner I* and *II*, to disclose exculpatory evidence concerning Evans's inability to pick the appellant out of at least one police photo lineup as the man with Candy at the bank on the morning of the murders, even though she identified him in open court as that man during his third trial. The State contends, however, that there was no evidence of prosecutorial misconduct. In support of his contention, the appellant points to the fact that Trooper Don Windham of the Missouri State Highway Patrol testified during a deposition that he told the prosecutor in *Barriner II* that Evans had been shown police photo lineups. However, our detailed review of the record indicates that the appellant never presented any evidence with respect to his double jeopardy claim. Although his double jeopardy claim for dismissal was included in his motion to dismiss, which was overruled on all grounds alleged prior to opening statements, the appellant never presented any evidence in support of his motion. "Because double jeopardy is an affirmative defense, it is the defendant's burden to prove that double jeopardy applies." *State v. Mullenix*, 73 S.W.3d 32, 34 (Mo.App. 2002). Hence, because the appellant failed to introduce any evidence to support his contention that the State intentionally withheld the photo-lineup evidence in question to prejudice his case and deny him a fair trial, he failed in his burden of proof as to his motion to dismiss on the basis of double jeopardy such that the trial court did not err in denying his motion.

Point denied.

## Conclusion

The judgment of the circuit court, convicting the appellant of two counts of murder in the first degree and sentencing him to consecutive terms of life imprisonment without probation or parole, is affirmed.

HOWARD and NEWTON, JJ., concur.